Frederick J. CHRVALA, Plaintiff,

v.

BORDEN, INC., et al., Defendants.

No. C2: 96 CV 01258.

United States District Court,
S.D. Ohio,
Eastern Division.

July 16, 1998.

James Scott Mowery, Jr., Mowery and Youell, Worthington, OH, for plaintiff.

Steven T. Catlett, Jones Day Reavis & Pogue, Columbus, OH, for defendants.

### OPINION AND ORDER
MARBLEY, District Judge.

### I. INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 27) and Plaintiff's Motion for Partial Summary Judgment (doc. 17). Plaintiff Frederick Chrvala brings this action against Defendants Borden, Inc. ("Borden") and Borden International, Inc. ("Borden International") alleging breach of his employment contracts, promissory estoppel, and tortious interference with a prospective business opportunity. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons set forth below in this opinion, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion for Partial Summary Judgment is **DENIED.**

### II. FACTUAL BACKGROUND

Chrvala began his employment with Borden, Inc. ("Borden") in 1968, eventually becoming an executive with Borden Chemicals. In 1989, Borden asked Chrvala to accept a position in Singapore as the primary executive in charge of Borden Chemical's operations in Asia. In this position, Chrvala was the primary liaison between Borden's headquarters in Columbus, Ohio, and its various entities in Australia, New Zealand, Malaysia, the Phillippines, and Japan.

Chrvala signed two employment contracts in 1989—one on January 1, 1989, with Borden, Inc. ("the Borden Agreement"), and another on November 1, 1989, with Borden International, Inc. ("the Borden International Agreement"). Both contracts provided that, in general, either party could terminate plaintiff's employment at any time for any reason so long as the terminating party pro-

vided notice or payment in lieu of notice. Specifically, the Borden International Agreement stated that:

The Executive [plaintiff] may terminate the employment at any time by giving one month's notice in writing. The Company may terminate the employment at any time by giving three month's notice in writing. The Company reserves the right to make payment in lieu of notice.

Similarly, the Borden Agreement stated that "[e]mployment under this Agreement shall commence as of November 1, 1989 and shall continue until terminated upon the giving of thirty (30) days written notice by either party."

Both contracts also contained an additional section dealing with termination for cause. The Borden International Agreement provided that Chrvala's employment "shall terminate and his remuneration and benefits shall cease to accrue forthwith" if one of the conditions is met:

(I) his death; or

(ii) his inability (other than temporary inability due to illness or injury) to perform his duties hereunder; or

(iii) any material failure by him to observe to perform his obligations contained in Clause 10 or 11; or

(iv) willful failure to discharge those duties and responsibilities he is presently discharging.

The Borden Agreement likewise provided that Chrvala's employment "shall terminate ... forthwith" upon, among other limited reasons, his "willful failure to discharge" his duties.

In 1992, Chrvala was promoted to Group Managing Director—Far East Operations for Borden Chemical Packaging and Industrial Products ("Borden Packaging"), a division of Borden Chemical. In that capacity, Chrvala was ultimately responsible for the operations of Borden Packaging's divisions in Australia, New Zealand, Malaysia, the Phillipines, and Japan. The operations or general managers of these divisions reported directly to Chrvala.

Each division also maintained a controller, who reported to an Area Group Controller. From 1992–96, the Far East Group Controller was Thomas Lim, who shared an office with Chrvala in Singapore. While Lim had a coordinate reporting relationship with Chrvala, Chrvala did not directly supervise Lim.

In early 1995, Kohlberg, Kravis & Roberts ("KKR") purchased a majority interest in Borden, and installed Robert Kidder as the CEO. Borden decided to restructure Borden Packaging into stand-alone companies based on product lines. Accordingly, Borden established Borden Global Packaging ("Borden Global"), of which Chrvala became Vice–President/Group Managing Director for its Asia/Pacific packaging operations. In this capacity, Chrvala was no longer responsible for Borden Chemical's operations in Australia, Malaysia and the Phillipines.

In early 1996, Borden entered into negotiations with AEP for the purchase of its Borden Global unit. As part of an effort to keep key Borden Global executives in place, Jerold J. Golner, President and CEO of Borden Global, wrote a letter to Chrvala on February 29, 1996 ("the Golner Letter"), offering financial incentives, such as a "sale bonus" equal to six months base salary and a severance package equal to one year's base salary. These financial incentives were "conditioned upon [the executives'] continuing to perform [their] jobs at a satisfactory level and continuing to remain in [Borden Global's] employ through the date of sale ... and if requested through a transition period not to exceed thirty days after the sale." The sale of Borden Global to AEP closed on October 11, 1996.

In July, 1996, during the sale negotiations between Borden and AEP, Trevor Bassingthwaighte, a newly hired controller for Borden Chemical Australia, discovered a July 2, 1996, letter from Incitec, who supplied urea to Borden. In the letter, Incitec demanded that Borden repay the outstanding balance on an advance from Incitec to Borden. The letter, which Bassingthwaighte interpreted as a demand for loan repayment, requested that Borden pay the balance in cash or, in the alternative, increase the price paid by Borden for urea.

Bassingthwaighte reported the letter to his superior, William Wardly, the controller for all of Borden Chemical, who instructed Bassingthwaighte to investigate the transaction

without focusing the inquiry on any particular person. Bassingthwaighte reported back that senior Incitec informed him that Chrvala, who was Vice–President of Borden Chemical's Asia/Pacific operations from 1989–95, had requested an advance from Incitec in 1995, modeled after a similar 1993 transaction between the parties. According to Bassingthwaighte, the Incitec managers explained that Chrvala requested an advance in 1993, which Borden would repay by paying an inflated urea price in 1994, that price also including interest on the advance. The alleged 1993 advance was for $200,000; the 1995 for $500,000.

On August 1, 1996, Wardly conveyed the results of Bassingthwaighte's preliminary investigation to Joseph Saggese, Chairman, President and CEO of Borden Chemical. Wardly informed Saggese that the urea arrangement with Incitec "lacks a business purpose." Saggese, in turn, conveyed this information to Kidder, CEO of Borden, noting that, based on the preliminary investigation, it would appear that Chrvala was involved in the transactions. Kidder responded by initiating an in-depth investigation to gather "more information" about the transactions so that he could decide whether the urea transactions involved a willful violation of policy, and who was involved in those transactions. Kidder appointed Joseph Powell, Borden's Chief of Security, Debbie Roche, a Borden Vice President and General Auditor, and Ray Caldwell, Borden Chemical's Chief Financial Officer, to lead the team of financial investigators.

The investigation team traveled to Australia and interviewed Incitec managers Allen Back and Robert Ravens about the 1993 and 1995 urea transactions. Ravens told the investigators that Chrvala initiated the 1993 urea transaction during a 1993 meeting in Singapore. According to Ravens, Chrvala asked Incitec to advance Borden approximately $200,000, to be repaid by Borden in 1994 with Borden paying Incitec an artificially increased price for urea.

The investigation revealed that the urea transaction was accounted for as a direct reduction of 1993 costs, which improved the division's net practicability. Although the advance allegedly was designed to be repaid in 1994, Borden Chemical's books did not reflect any liability, which allegedly contravened Borden's accounting policy. The books also reflected that the advanced money was paid back in 1994 in the form of higher urea prices.

Ravens and Back described the 1995 urea transaction as a duplicate of the 1993 transaction. According to Ravens and Back, during a mid–1995 meeting in Singapore, Chrvala expressed his gratitude to them for the 1993 urea transaction and asked if the parties could enter into another advance urea transaction, this time for $500,000. Again, the investigation revealed that the urea transaction was recorded as income with no corresponding entry reflecting the repayment obligation. The investigation revealed that with the 1995 urea transaction, however, Borden Chemical fell behind in its payments, which triggered the July 2 demand letter from Incitec.

After taking the statements of the Incitec officers, the Powell Investigation team questioned former Borden Chemical–Australia General Manager Peter Lawrence and former Borden Chemical–Australia Controller Ed Galven about the urea transactions. The two former employees, who were eventually discharged in part for their roles in the urea transactions, corroborated the Incitec managers' account of the transactions.

Powell than traveled alone to Singapore to interview Chrvala for several hours. Chrvala was informed of what the other witnesses said about the transactions. Chrvala denied the allegations against him, asserting that the 1993 transaction was not an advance, but rather a rebate with no repayment obligation. Chrvala also told Powell that he was unaware of the 1995 transaction.

Powell then returned to the United States where he prepared a report ("Powell Report") summarizing the evidence gathered during the investigation. The Powell Report was then submitted to a group consisting of Kidder, Roche, Saggese, and Borden Chief Financial Officer William Carter.

Kidder convened a meeting of the group in late August, 1996, to discuss the findings in the Powell Report and whether any personnel action was warranted. Kidder, Borden's

highest ranking executive, concluded that from the investigation and the Powell Report that Chrvala should be discharged immediately for his role in the 1993 and 1995 urea transactions. Kidder felt that the Powell Report clearly established "beyond a shadow of [a] doubt" that Chrvala's management team "had been involved in a willful and intentional violation of policy." Accordingly, on August 30, 1996, Borden discharged Chrvala as well as the other employees involved in the 1993 and 1995 urea transactions, Lawrence and Galven.

Chrvala then filed suit in this Court, alleging, *inter alia:* (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) recovery of benefits under ERISA; (4) interference with ERISA rights; (5) tortious interference with business opportunity; (6) deceptive trade practices disparagement; and (7) promissory estoppel. The breach of covenant of good faith and fair dealing claim was dismissed in a prior ruling by this Court, and Chrvala voluntarily dismissed the two ERISA claims, thus leaving the four claims which are the subject of this opinion.

### III. LEGAL ANALYSIS

#### A. Standard For Summary Judgment

Rule 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (Summary judgment appropriate where the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

#### B. Breach of Contract Claim Based on the Borden and Borden International Agreements

■ The appropriate standard for determining whether an employer's decision to discharge an employee for "just cause" is whether the employer had reasonable grounds for believing that the alleged misconduct occurred (hereinafter "the 'reasonable grounds' standard"), and whether the decision was made in good faith and on the basis of substantial evidence. *See, e.g., Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Zimmerman v. Eagle Mortgage Corp.,* 110 Ohio App.3d 762, 675 N.E.2d 480 (2d Dist.1996); *Hills v. Cleveland Foundation, et al.,* 1987 WL 14184 (Ohio App.8th Dist.1987).

In *Churchill,* the Supreme Court adopted the "reasonable grounds" standard in determining the propriety of a government employee's discharge for cause. In that case, the Plaintiff was discharged for allegedly making disparaging remarks about her department to another employee who, at the time of the conversation, was considering a transfer into the Plaintiff's department. *Churchill,* 511 U.S. at 665–66, 114 S.Ct. 1878. Defendant made its decision to discharge the Plaintiff on the basis of reports as to the substance of the considerations by the employee who was a party to the conversation

as well as another employee who overheard the conversation *Id.* Plaintiff, as well as two others who overheard the conversation, denied that the Plaintiff made disparaging rewards during the conversation. Instead, they claimed that the Plaintiff expressed concern regarding a certain training policy in her department. *Id.* at 666, 114 S.Ct. 1878. The two employees who corroborated the Plaintiff's version of the conversation were never interviewed by the Defendant. *Id.*

The Supreme Court held that the appropriate standard for reviewing the employer's decision is looking at the facts as the employer found them to be, whether the employer reached to its decision in good faith and on the basis of reasonable grounds. *Id.* at 677, 114 S.Ct. 1878.

Despite the Plaintiff's claim that the government's employment decision abridged her First Amendment rights, the government's interest in achieving its goals both effectively and efficiently as possible is elevated from the subordinate, when it acts as a sovereign, to significant when it acts as an employer. *Id.* at 675, 114 S.Ct. 1878. The Court observed that a rule which would require "absolute certainty" to justify a discharge for cause is fraught with problems:

> The problem with the Court of Appeals' approach ... is that it would force the government employer to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court. The [employer] would have to ask not what conclusions she, as an experienced professional, can draw from the circumstances, but rather what conclusions a jury would later draw. If she relies on hearsay, or on what she knows

about the accused employee's character, she must be aware that this evidence might not be usable in court. If she knows one party is, in her personal experience, more credible than another, she must realize that the jury will not share that personal experience. If she thinks the alleged offense is so egregious that it is proper to discipline the accused employee even though the evidence is ambiguous, she must consider that a jury might decide the other way.

> But employers, public and private, often do rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on other factors that the judicial process ignores. Such reliance may sometimes be the most effective way for the employer to avoid future recurrences of improper and disruptive conduct. What works best in a judicial proceeding may not be appropriate in the employment context. If one employee accuses another of misconduct, it is reasonable for a government manager to credit the allegation more if it is consistent with what the manager knows of the character of the accused. Likewise, a manager may legitimately want to discipline an employee based on complaints by patrons that the employee has been rude, even though these complaints are hearsay.

*Id.* at 675–76, 114 S.Ct. 1878.[1]

Similarly, Ohio law recognizes that the relevant inquiry in determining the propriety of a "just cause" termination is whether the employer engaged in a good faith fact-finding investigation and whether the decision was founded upon substantial evidence. In *Hills*, the plaintiff was discharged for allegedly

---

**1.** In *Cotran v. Rollins Hudig Hall Intl.,* 17 Cal.4th 93, 69 Cal.Rptr.2d 900, 948 P.2d 412 (1998), the California Supreme Court noted that prudential policy considerations weigh heavily in favor of the "reasonable grounds" standard:

> Allowing a jury to trump the factual findings of an employer that an employee has engaged in misconduct rising to the level of good cause for discharge, made in good faith and in pursuit of legitimate business objectives, is a highly undesirable prospect.... In effect, such a system would create the equivalent of a preeminent fact-finding board unconnected to the challenged employer, that would have the ultimate right to determine anew whether the employer's decision to terminate an employee was

> based upon an accurate finding of misconduct.... This ex officio fact-finding board, unattuned to the practical aspects of employee suitability over which it would exercise consummate power, and unexposed to the entrepreneurial risks that form a significant basis of every state's economy, would be empowered to impose substantial monetary consequences on employers whose employee termination decisions are found wanting.

*Id.* at 104, 69 Cal.Rptr.2d 900, 948 P.2d 412 (punctuation omitted) (citation omitted). This Court agrees with the *Cotran* court that hindsight evaluation of the wisdom of employment decisions is contrary to the policy behind the business judgment rule.

leaving a threatening note by the home door of one of her superiors. *Hills,* 1987 WL 14184 at *2. Following an investigation into the incident, including analysis by a handwriting expert, the employer determined that the plaintiff was behind the note and discharged her for cause accordingly. In an effort to overturn her termination, the plaintiff followed the employer's internal review process, all along maintaining that she did not write the note. *Id.* at *3–4. Following her unsuccessful trip through the review process, the plaintiff sued for, among other things, wrongful termination/breach of contract. *Id.* at *4. The appellate court affirmed the trial court's decision to grant the employer's motion for summary judgment. In determining whether plaintiff's discharge was appropriate, the court stated that "[t]he issue then becomes whether, despite appellant's denial of misconduct, the Clinic's termination of appellant was made in good faith and on the basis of substantial evidence." *Hills,* 1987 WL 14184 at *5. Under this standard, court found:

> Construing the evidence in the light most favorable to the appellant, the non-movant, reasonable minds could only conclude that the Clinic acted in good faith when they discharged the appellant. The Clinic terminated her in accordance with its handbook and internal operations memoranda. The Clinic then followed its right of review process in upholding appellant's termination.
>
> Accordingly, the court properly granted to [the Clinic] summary judgment upon [plaintiff's] wrongful discharge claim.

*Id.* at *7.

■ Chrvala argues that an employer must demonstrate that the accused employee did, in fact, commit the alleged acts for which the employee was discharged. In support of his position, Chrvala cites *Zimmerman.* In

*Zimmerman,* an Ohio appellate court found that two employees were wrongfully discharged for "just cause" where the evidence demonstrated that the employees had not engaged in the conduct which formed the basis of the employer's decision to discharge. *Zimmerman,* 110 Ohio App.3d at 774, 675 N.E.2d 480. However, such an evidentiary finding by a court is wholly consistent with the "reasonable grounds" standard, because the evidence demonstrates the *unreasonableness* of the investigatory process. The Supreme Court in *Churchill* addressed this exact issue:

> We think employer decision making will not be unduly burdened by having courts look to the facts as the employer reasonably found them to be. It may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available—if, for instance, an employee is accused of writing an improper letter to the editor, and instead of just reading the letter, the employer decides what it said based on unreliable hearsay. If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are conducted. It should, however, be the care that a reasonable manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case.

*Churchill,* 511 U.S. at 677–78, 114 S.Ct. 1878.[2] *Zimmerman* does not, as Chrvala

---

2. With respect to the "reasonable grounds" standard, the Supreme Court's decision in *Churchill* is consonant with its decision in *NLRB v. Burnup & Sims, Inc.,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). There, the Court held that the employers wrongfully discharged two employees where the employer later found that employees had not engaged in any misconduct. The Court rejected the employer's claim that the discharges were proper because the employer acted in good faith. *Id.* at 22, 85 S.Ct. 171.

However, the Court in *Churchill,* noted that "[i]t is necessary that the decision maker reach its conclusion about [the alleged misconduct] in good faith, rather than as a pretext; *but it does not follow that good faith is sufficient." Churchill,* 511 U.S. at 677, 114 S.Ct. 1878. Indeed, the Court implicitly recognized that the employer's decision must be made on the basis of reasonable grounds and substantial evidence.

claims, stand for the proposition that an employer must be able to prove, with absolute certainty, that the discharged employee engaged in the wrongful conduct.

Thus, the primary issue with which this Court is concerned is whether Borden conducted a good faith and reasonable investigation of the urea transactions, and whether the investigation uncovered reasonable grounds to justify Chrvala's discharge for "just cause."

As noted above, Borden engaged in a fairly detailed investigation regarding the 1993 and 1995 urea transactions. Chrvala asserts the following grounds upon which there are genuine issues of fact with respect to Borden's "reasonable grounds":

1) "Just cause" and "willful failure" are jury issues *per se;*

2) The report implicating Chrvala was flawed;

3) The decision to terminate Chrvala was predisposed.

■ Chrvala cites *Villagran v. Central Ohio Bus. Servs.,* 1995 WL 347419 (Ohio App.10th Dist.1995) for the proposition that "just cause" is *per se* a question of fact. While the case does in fact state this proposition, this Court is loathe to follow such a broad and far-reaching statement of the law which can be found nowhere else, not even in the Ohio Supreme Court decision cited by the appellate court for the proposition. *See Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). Such a rule of law would completely stand Rule 56, as well as the *Celotex/Anderson/Matsushita* trilogy, on their collective summary judgment heads.

■ Chrvala also alleges that the Powell Report was flawed because he disputes many of the facts set forth in the report regarding

the reasons for his termination. First, while Borden asserts that Chrvala was terminated for willfully violating its financial reporting rules and ethos, Chrvala claims that he was told during his Termination Meeting that he was being discharged for the 1995 $1.2M overstatement of income, of which only part was related to the urea transactions. Second, Chrvala asserts that the urea transactions took place in December, 1995, which was after he had been reassigned from Borden Chemical to Borden Global Packaging. Third, Chrvala insists that he considered the transaction a rebate, and had no idea that his subordinates had re-structured the transaction as a loan. Fourth, Chrvala claims that the report makes no mention of the role of one of the employees, Galven, who was terminated for "cooking the books." [3]

Finally, Chrvala alleges that the decision to discharge him was made well before the Powell Investigation began. In support of his claim that the Powell Investigation was pretextual, Chrvala notes that Sagesse testified that he made the decision to terminate Chrvala on August 1, 1996, well before the beginning of the Powell Investigation. [4] Also, Chrvala points to two memoranda written by Saggese on August 1, 1996, one of which was sent to Kidder, in which Saggese states that Chrvala will be "dealt with."

The Court finds that these allegations are material to the issue of whether the Powell Investigation was conducted in good faith and whether Chrvala's discharge was based on reasonable grounds and on the basis of substantial evidence. Chrvala has demonstrated that genuine issues of material fact exist with respect to the reasonableness and good faith of the investigatory process which led Kidder and Borden to its ultimate conclu-

**3.** Chrvala's allegations regarding certain inaccuracies in the Powell Report are not undisputed. Borden counters by noting that Incitec Manager Ravens testified that Chrvala requested the 1995 urea transaction at a mid–1995 meeting, a meeting which Chrvala admits to attending. Also, Golner testified that Chrvala remained involved in certain Borden Chemical projects after his reassignment to Borden Global Packaging. Finally, Borden argues that the other transactions which were responsible in part for the 1995 $1.2M overstatement of income are irrelevant because the Powell Investigation and report were solely focused on the urea transactions. The

weight and credibility of both parties' allegations are a matter for a jury to decide. For the purposes of the present summary judgment motion, the Court is prohibited from making such determinations.

**4.** Later his deposition, Saggese testifies that he erred in giving August 1 as the date he made up his mind that Chrvala should be terminated. Saggese testified that, after reviewing the deposition exhibits, he realized that he mistakenly stated the date of the meeting with Kidder and Roche, the meeting which led to the decision to terminate Chrvala.

sion to terminate Chrvala. Based on the foregoing, the cross-motions of the parties for summary judgment on the breach of contract claim, as it relates to the Borden and Borden International Agreements, are **DENIED.**

### C. Breach of Contract Claim Based on the Golner Letter

■ Chrvala argues that the Golner Letter constituted an additional employment contract between the parties. He contends that the letter was designed to maintain the stability of senior management at Borden Global, during the sale of the division, by promising financial rewards to certain executives in return for their continued employment with the division. He argues further that the Golner Letter demonstrates that the Defendants expected the letter to induce action or forbearance by the executives. Specifically, Chrvala contends that the Defendants expected the executives to forego seeking alternative employment during the pendency.

The Court finds that the Golner Letter cannot, as a matter of law, be construed as a contractual obligation. Chrvala cannot demonstrate, from the evidence in the record, that the promises of financial reward set forth in the Golner Letter were supported by valid consideration. The Golner Letter clearly states that the financial rewards—sales bonus, proration of any annual incentive, and severance pay—were contingent upon Chrvala "continuing to perform [his] job at a satisfactory level and continuing to remain in [Borden Global's] employ through the date of sale ..." Thus, the financial rewards were contingent upon Chrvala continuing to do that for which he was already obligated to do under the Borden and Borden International Agreements, which were still in effect at the time of the Golner Letter. Neither a promise to do an act, nor the actual performance of the promise is sufficient to constitute valid consideration where the promise or performance of the promise is merely that which the party is already obligated to perform, either by law or an existing contract. *See Cohen & Co., CPAs v. Messina, CPA,* 24 Ohio App.3d 22, 492 N.E.2d 867 (8th Dist.1985); *Rhoades v. Rhoades,* 40 Ohio App.2d 559, 321 N.E.2d 242 (1st Dist.1974).

■ Moreover, the Sixth Circuit, applying Ohio law, has held that merely continuing to work or forbearing from seeking other employment, without more, does not constitute sufficient or adequate consideration to modify a pre-existing contractual relationship:

> *Henkel* and *Mers* make it clear that merely continuing to work cannot constitute additional consideration sufficient to modify [the] employment relationship. We see no difference between an employee's continuing his normal work and his forbearing from seeking other employment, and we attach no legal significance to such forbearance. We recognize that Ohio law *might* consider an employee's forbearing from *accepting an offer of other employment* sufficient to constitute additional consideration to support [the modification of the existing employment relationship]. In the present case, however, Humphreys had not received an offer of other employment which he could have turned down ... Under these circumstances, Humphreys' continuing to work for North American cannot constitute the additional consideration necessary ...

*Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1041 (6th Cir.1992) (discussing *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150 (1985) and *Henkel v. Educational Research Council,* 45 Ohio St.2d 249, 344 N.E.2d 118 (1976)).

■ Like the plaintiff in *Bellaire Corp.,* Chrvala asks this Court to hold that the *Colner* letters modified the Borden and Borden International Agreements without demonstrating any forbearance of legal consequence. Indeed, Chrvala has not produced any evidence which would show he either turned down other offers or discontinued an existing job search in lieu of the alleged promises in the Golner Letter. *See, e.g., Helmick v. Cincinnati Word Processing, Inc.,* 45 Ohio St.3d 131, 543 N.E.2d 1212 (1989).

Based on the foregoing, Borden's motion for summary judgment on the breach of contract claim, as it relates to the Golner Letter, is **GRANTED,** and Chrvala's motion for partial summary judgement is **DENIED.**

## D. Promissory Estoppel Claim

To assert a valid promissory estoppel claim under Ohio law, a plaintiff must demonstrate:

1) that the employer made a promise;

2) which the employer reasonably should have expected to induce action or forbearance by the employee;

3) that there was such action or forbearance (detrimental reliance); and

4) injustice can only be avoided by enforcement of the promise.

*Bellaire Corp.*, 966 F.2d at 1041.

Chrvala argues that he detrimentally relied on the representations in the Golner Letter. He asserts that Borden, via the Golner Letter, promised financial rewards in return for his continued employment with satisfactory performance through the sale to AEP, and alleges that he relied on this promise by not seeking employment during the pendency of the sale.

■ The rule, as established by the Ohio Supreme Court, is that a promise of future benefits cannot sustain a claim for promissory estoppel. *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 110–11, 570 N.E.2d 1095 (1991). In *Wing*, the plaintiff, a news anchor, agreed to stay on with the defendant, the new owner of his station following an acquisition. Prior to his discharge, the plaintiff alleged that the defendant constantly promised that he would have an opportunity to purchase equity in the station, and that he turned down several job opportunities with other stations. The Ohio Supreme Court held that the plaintiff did not establish a *prima facie* case of promissory estoppel. *Id.* While recognizing that the plaintiff believed that the promise of future equity ownership may have meant job security, the court held that a promise of financial reward is not equivalent to a promise of continued employment and, therefore, could not be reasonably relied upon as such. *Id.*

■ Similar to the plaintiff in *Wing*, Chrvala's financial rewards were not a promise for continued employment. In fact, the letter clearly states that the financial packages were "conditioned upon [the executives'] continuing to perform [their] jobs, at a satisfactory level." Based on the findings of the Powell Investigation, Borden determined that Chrvala's performance was not satisfactory, and terminated his employment as of August 30, 1996. Thus, Chrvala did not fulfill the requirements necessary to qualify under the detrimental reliance prong of the *prima facie* case.[5]

Based on the foregoing, Borden's motion with respect to promissory estoppel should be **GRANTED.**

---

5. Chrvala also cites *Tersigni v. General Tire, Inc.*, 91 Ohio App.3d 757, 633 N.E.2d 1140 (9th Dist. 1993) and *Helmick v. Cincinnati Word Processing, Inc.*, 45 Ohio St.3d 131, 543 N.E.2d 1212 (1989), for the proposition that continuing to work after receiving a promise of financial reward from an employer constitutes detrimental reliance. The Court, however, finds that these cases support the holding in *Wing*, and are factually distinguishable from the present case. In *Tersigni*, the defendant instituted a policy whereby more senior employees would displace, or "bump," less senior employees during layoffs. Plaintiffs, senior employees who were laid off after the policy went into effect, complained that they continued working for the defendant in reliance on the job security and protection offered by the bumping policy. The court found that genuine issues of material fact existed with respect to the plaintiffs' claims of promissory estoppel—in particular, detrimental reliance. The court found "that an employee did not seek other work after becoming aware of the employer's promise is enough to support detrimental reliance." *Tersigni*, 91 Ohio App.3d at 762–63, 633 N.E.2d 1140. However, that statement by the *Tersigni* court must be read in light of the holding in *Wing*, which requires that the promise be one for continued employment. In *Tersigni*, the promise to the plaintiffs was one for continued employment via a company policy which operated to shield more senior employees, such as plaintiffs, from reductions in force.

In *Cincinnati Word Processing, supra*, the Ohio Supreme Court ruled that Plaintiff had demonstrated triable issues of fact for a jury with respect to her detrimental reliance on Defendant's promises. Specifically, during her interview, Plaintiff alleged that Defendant promised her job security and opportunities for advancement if she *discontinued* her other interviews. *Cincinnati Word Processing*, 45 Ohio St.3d at 136, 543 N.E.2d 1212. Also, while employed by Defendant, Plaintiff alleged that she was promised a raise and continued employment if she stopped looking for other jobs. *Id.* Because Plaintiff in *Helmick* discontinued her other activities, namely seeking other employment, in response to Defendant's promises, the case is inapposite to Chrvala's, who has not alleged that he sought other employment or discontinued a job search.

## E. Tortious Interference Claim

Under Ohio law, to prevail on a claim for tortious interference with a prospective business opportunity, a plaintiff must demonstrate:

1) the existence of the prospect of a business relationship;

2) that defendant knew of the plaintiff's prospective relationship;

3) that defendant intentionally and materially interfered with the plaintiff's prospective relationship;

4) without justification; and

5) caused plaintiff to suffer damages.

*See, e.g., Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 650 N.E.2d 863 (1995); *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc.* 81 Ohio App.3d 591, 611 N.E.2d 955 (9th Dist.1992). In terms of causation, a plaintiff must show that "but for" the alleged interference the prospective relationship would have been consummated. *Leibovitz v. Central Nat'l. Bank, et al.,* 75 Ohio App. 25, 26, 60 N.E.2d 727 (8th Dist.1944).

 Chrvala alleges that "Borden employees" told Paul Feeney, an executive with AEP, that Chrvala was involved in a scheme to manipulate incentive payments. In support of this claim, Chrvala submits a file memo written by Feeney in which Feeney wrote that he "was advised by Borden people that Fred Chrvala was almost certainly involved in a scheme to [manipulate Borden Global's] earnings ..." Chrvala argues that this file memo is sufficient to raise a triable issue of fact on his tort claim.

The Court, however, finds that Chrvala has produced no evidence which would demonstrate a "but for" causal relationship between the alleged Feeney–Borden communication and AEP's decision not to hire Chrvala. The fact that the alleged communication regarding the charges against Chrvala at Borden may have been a factor in AEP's decision not to hire Chrvala is, without more, insufficient to raise a triable issue of fact. As the court in *Leibovitz* held, the causation element for a tortious interference with a prospective business opportunity claim requires something more than a showing that a particular course of conduct *may* have played a role in bringing about the harmful outcome. *Leibovitz,*

75 Ohio App. at 26–27, 60 N.E.2d 727. Tortious interference with a prospective business opportunity requires that a party demonstrate that a particular course of conduct was *necessary* to bring about the harmful outcome:

> When the parties have entered into a contract, the terms of which are fixed, the plaintiff is only required to show the malicious interference and the damage proximately resulting; whereas, if the ground of complaint is that [the plaintiff] was *about to make a contract,* [the plaintiff] is required to go further and show that he was not only 'about to,' [sic] but would, *but for* the malicious interference of defendants, have entered into the contract ...

*Lewis v. Bloede,* 202 F. 7, 17 (4th Cir.1912) (cited and relied upon in *Leibovitz, supra*) (emphasis added).

Here, Chrvala has not, and can not, demonstrate that the alleged Feeney–Borden communication necessarily caused AEP to decide not to employ him. In fact, Feeney states in his file memo that it was the discovery of Chrvala's disparaging remarks about AEP which formed the basis of AEP's decision to discontinue any further employment discussions with Chrvala:

> On September 31 [Feeney] was contacted [by] Geoff Mullins (the consultant in Australia) and told that Fred Chrvala ... stated fairly derogatory things about AEP. Prior to this I did not know anything about the outcome [of Chrvala's Termination Meeting in Columbus, Ohio] but I had resolved that my previously noted suspicions about Mr. Chrvala's overall competence combined with what I considered a very flagrant breach of confidentiality and professional ethics mitigated against a continued relationship with Mr. Chrvala in any form.

Indeed, Chrvala's argument that the Feeney–Borden communication was causally connected to his failure to be hired by AEP is fatally weakened by Feeney's statement regarding his "previously noted suspicions" regarding Chrvala's "overall competence," as the statement is directly contrary to any claim that Chrvala was "under consideration" prior to the alleged communication.

Based on the foregoing, Borden's motion for summary judgment on the tortious interference claim is hereby **GRANTED**.

### F. Deceptive Trade Practices Disparagement Claim

 Chrvala's claim for deceptive trade practices disparagement, under O.R.C. § 4165.02, fails as a matter of law. Under Ohio law, a claim for deceptive trade practices disparagement lies if Chrvala can establish that his services were disparaged by Borden's false representation of fact to AEP. Ohio Rev.Code § 4165.02(H). Chrvala must also show that he was damaged by the alleged false representation of fact. Ohio Rev.Code § 4165.03.

As set forth in the tortious interference analysis, Chrvala has failed to produce evidence which would establish that the alleged disparaging communication necessarily caused AEP not to hire Chrvala as a consultant. The statute clearly requires a causal relationship between the disparaging communication and the alleged harm. Here, Chrvala has failed to demonstrate the necessary causal relationship or, put another way, that he suffered "actual damages." Ohio Rev. Code § 4165.03.

Based on the foregoing, Borden's motion for summary judgment on the deceptive trade practices disparagement claim is hereby **GRANTED**.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**