**David A. YOUNG, Plaintiff–Appellant,**

v.

**AMERICAN DIABETES ASSOCIATION, Defendant–Appellee.**

No. 00–3882.

United States Court of Appeals, Sixth Circuit.

Feb. 7, 2002.

Before SILER and COLE, Circuit Judges; STAFFORD,* District Judge.

* The Honorable William Stafford, United States District Court for the Northern District of Florida, sitting by designation.

## OPINION

COLE, Circuit Judge.

Plaintiff David Young appeals the district court's grant of summary judgment in favor of defendant American Diabetes Association ("the ADA"), assigning error to the district court's determination that defendant had just cause for terminating Young under his employment contract. Young sued the ADA, claiming that he was terminated without just cause in violation of his employment agreement and Ohio public policy. The district court, in an order dated June 16, 2000, granted the ADA's motion for summary judgment on all claims. For the reasons set forth below, we AFFIRM the judgment of the district court.

## BACKGROUND

### A.

The ADA's predecessor organization, the American Diabetes Association Ohio Affiliate, Inc. ("the ADAOA"), hired Young on April 1, 1988. For the first few years of his employment, Young served in a multitude of management positions. On July 28, 1995, Young signed an employment agreement wherein he agreed to assume the position of Executive Vice President. That agreement provides that employment may be terminated for "just cause," defined as "including, but not limited to, proven dishonesty, fraud, or misrepresentation that prevent the effective performance of the Executive Vice President's duties."

In May 1998, the ADAOA and ADA entered into a merger agreement, whereby the ADAOA became a multi-state division of American Diabetes Association, known as the Heartland Region. On January 16, 1998, the ADA tendered a written offer of employment to Young for the position of Executive Vice President, Heartland Region. That written offer incorporated the terms of Young's original employment agreement.

Prior to this merger and as early as 1994, Young became involved in an internal group that was very critical of the administration of the ADA. This group drafted a paper entitled "A Review of Certain Current Trends and Issues in the American Diabetes Association," also known as the "White Paper." The White Paper criticized the administration of the ADA and alleged, among other things, poor structure and financial policy and "significant trust, respect and relationship issues throughout the organization." Many of the sixteen signatories to the White Paper are no longer employed by the organization.

In the beginning of July 1998, shortly after the absorption of the ADAOA into the ADA, the ADA received numerous complaints regarding Young's conduct. In particular, subordinates complained that Young made inappropriate sexual references to numerous female employees and used profanity in directing subordinates. On July 10, 1998, Young and John Graham. Chief Executive Officer of the ADA, along with other ADA board members, discussed these complaints in a telephone meeting. Young denied all of the accusations. Following the meeting, employees continued to file complaints against Young, stating that he had threatened them professionally and physically once he found that they had filed complaints regarding his conduct. On July 21, 1998, the ADA placed Young on paid administrative leave while it conducted an investigation of all complaints made against him. The ADA directed Young not to interact with any employees until the investigation was complete.

On August 3, 1998, Young filed an action against the ADA for anticipatory breach of contract in the Court of Common Pleas of Franklin County, Ohio. Jerry W. Lee, Chief Executive Officer of the Heartland Region, testified in his deposition that John Graham indicated to him that he wanted to fire Young for filing a lawsuit against the ADA.

In late August, Gail Brooks, the ADA's Vice President of Human Resources, submitted to Young a written representative sample of the complaints made against him, and gave him an opportunity to respond. Young, through his counsel, categorically denied all of the allegations and requested a meeting to discuss the complaints. On September 18, 1998, the ADA hired an independent investigator, Claudia Graham, (no relation to John Graham) to interview Young's fellow employees regarding his conduct. In a report submitted to the ADA, Ms. Graham recounted several incidents of inappropriate conduct on the part of Young. Employees recounted that Young notified them that he would increase their compensation by "padding" their expense reimbursements. Young also repeatedly used derogatory racial terms in the office, including "nigger," "dago," "jap," "spic," and "rednecks." He also told a co-worker that an African–American employee "is working with black churches even though she is a secretary because she speaks their language." One subordinate recounted that "David Young would never refer to anyone without also telling you their ethnic and/or religious background."

Ms. Graham found that Young also made numerous inappropriate sexual references to and about female employees. In particular, on one occasion, Young remarked to coworkers that he "would like to put his face between a certain woman's breast." On a separate occasion, Young also remarked in front of male and female coworkers, "wouldn't you like to be titty-slapped and nipple scratched by that one." Subordinates also complained that Young was repeatedly verbally abusive and threatening—so much so that they were uncomfortable returning to work each day.

On October 13, 1998, the ADA notified Young that after considering the contents of Ms. Graham's report, Young would be terminated under the "just cause" provision of his employment contract.

### B.

Young's suit alleges that the ADA breached his employment contract and wrongfully discharged him in violation of Ohio public policy. Specifically, Young asserted that he was terminated for impermissible reasons: because of his outspoken stance against the administration of the ADA and his suit against the ADA after he was placed on administrative leave. Young also brought a claim for non-payment of benefits under Employee Retirement Income Security Act (ERISA). The ADA brought a counterclaim for defamation[1] and removed the case to the Southern District of Ohio under 28 U.S.C. § 1332. Both parties moved for summary judgment on all claims brought against them. The district court granted summary judgment to defendant on all claims and to plaintiff on the defamation counterclaim.

On appeal, Young challenges only the lower court's determination of his breach

---

1. The ADA brought a defamation claim against Young, claiming that since his termination he has authored several articles and news releases regarding alleged corruption at the ADA. The district court granted summary judgment to Young on this claim. The ADA does not appeal the grant of summary judgment

of employment contract claim. In particular, he alleges that the district court erred in applying the proper standard for determining just cause. In the alternative, Young asserts that even if the court applied the correct standard, there still exists a genuine issue of material fact as to whether Young was discharged in retaliation for bringing suit against the ADA. Young argues that this factual dispute precludes summary judgment.

Standard of Review and Applicable Law

We review *de novo* a district court's order granting summary judgment. *See Avery v. King*, 110 F.3d 12, 13 (6th Cir. 1997). Summary judgment is appropriate when there exists "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial" such that a jury reasonably could find for Young. *Id.* at 250, 106 S.Ct. 2505 (citing Fed.R.Civ.P. 56(e)).

The district court retained federal question jurisdiction over Young's ERISA claim under 28 U.S.C. § 1331 and exercised supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367. Therefore, as only state law claims remain upon appeal, this court must apply Ohio law as we presume the Ohio Supreme Court would apply it. *See Greyhound Food Management Inc. v. City of Dayton*, 852 F.2d 866 (6th Cir.1988). "If the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it." *Id.* at 868.

## DISCUSSION

### A.

Ohio law provides that an employee may not be terminated under the just cause provision of an employment contract unless he engages in an affirmative act of misconduct. *See Zimmerman v. Eagle Mortgage Corp.*, 110 Ohio App.3d 762, 675 N.E.2d 480, 487 (1996). The acts of the employee must be "akin to conduct that necessarily injures the place of employment." *Id.* Where an employee is accused of such conduct yet denies the allegations, an employer is required to determine just cause with good faith and on the basis of substantial evidence. *See Chrvala v. Borden, Inc.*, 14 F.Supp.2d 1013, 1017 (S.D.Ohio 1998). *See also Hills v. Cleveland Found.*, 1987 WL14184 *5 (Ohio Ct.App. July 9, 1987)(where an employee denies acts of misconduct, "the issue becomes whether, despite appellant's denial of misconduct, [defendant's] termination of [plaintiff] was made in good faith and on the basis of substantial evidence.").

An employer need not determine that there is just cause for terminating an employee on the basis of actual, admissible evidence. *See Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)(explaining that it is inappropriate to force an "employer to come to factual conclusions through procedures that substantially mirror the evidentiary rules used in court ... [employers] often do rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on other factors that the judicial process ignores."); *see also Chrvala*, 14 F.Supp.2d at 1019 ("*Zimmerman* does not

stand for the proposition that an employer must be able to prove, with absolute certainty, that the discharged employee engaged in wrongful conduct.").

■ In the instant case, Young's former co-workers accused him of numerous acts of misconduct, only some of which he attempts to refute. ADA employees recounted that Young constantly used racial epithets in the workplace, including "nigger," "kike," "dago," "spic" and "jap." In an affidavit, Young denied uttering such epithets; however, before signing the affidavit, Young crossed out the term "jap" and initialed the marking, essentially conceding that he had used the term in the workplace. Young also did not refute or challenge any of the allegations made by multiple employees about the numerous sexually explicit remarks he made in the work environment. Because Young has failed to rebut these allegations, they are to be entered into the record as true. *See Fitzke v. Shappell*, 468 F.2d 1072, 1077 (6th Cir.1972)("That affidavits filed in support of a motion for summary judgment are not controverted does not necessarily require its being granted, although the statements contained therein must be accepted as true.").

Beyond Young's *de facto* admissions of misconduct, the ADA also relied upon the findings of the independent investigator, Claudia Graham. Ms. Graham's report reflects the notes of multiple interviews with twenty-two employees, all of whom either corroborated the allegations or had no knowledge of their veracity. Ms. Graham asked each interviewee if they would be willing to testify, ostensibly under oath, to the contents of their interview and most interviewees assented. Furthermore, many interviewees admitted that if Young were allowed to return to the ADA, they would likely quit, as they could not work with him anymore.

Acting upon these set of facts, the ADA was justified in concluding that just cause existed to terminate Young's employment. Young in effect concedes that he made sexually explicit comments and used the term "jap" in the workplace. Furthermore, even though he denied allegations of misconduct, the contents of Ms. Graham's report constitute a reliable source of substantial evidence that he did indeed engage in such conduct. Young's subordinates were consistent is their accounts of Young's behavior; many were willing to testify under oath as to Young's conduct and stated that they would not return to work if Young did. It was reasonable for the ADA to conclude that Young's actions not only negatively affected the productivity of the workplace, but also could potentially expose the ADA to liability under the various federal anti-discrimination laws. Young's acts, as the ADA understood them to be, constituted multiple acts of misconduct and thus grounds for his termination under the just cause clause of his employment contract.

### B.

■ Young alleges that even assuming that the contents of Ms. Graham's report are true, there exists a genuine issue of material fact as to the ADA's good faith reliance upon it in deciding to terminate his employment. In particular, Young asserts that the ADA had ulterior motives for terminating him, namely that he had been a long-time opponent of the administration of the ADA, and that the ADA was retaliating against him for filing a claim for anticipatory breach of contract while he was on administrative leave. To support his assertion, Young points to the deposition of Jerry W. Lee, who stated that John Graham told him in a telephone conversation "that [originally Graham] was going to find another [position within the

ADA] for David [Young], but since [Young] sued him he was going to fire him." Young argues that because this statement was made prior to when Ms. Graham was hired by the ADA to conduct the internal investigation, there is a question as to whether the ADA acted in good faith in relying upon the contents of her report.

What Young does not account for in making this argument is the fact that at the time John Graham's statement was made, the ADA had already received numerous complaints about Young's conduct and had, through its own interviews, determined that such conduct had caused pervasive problems in the office. Furthermore, at the time the statement was made, the ADA had already placed Young on administrative leave. Therefore, just cause already existed such that Young's employment contract could be lawfully terminated. Considering the context of Graham's statement, as well as the overwhelming facts regarding Young's misconduct, it is unlikely that the single statement of John Graham is, by itself, "evidence such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). That Young had been involved in the White Paper and was known to be critical of the ADA is likewise of little relevance: there is no evidence in the record reflecting that this was a factor in the ADA's decision to terminate Young. Given these considerations, the ADA possessed reasonable grounds for determining just cause.

## CONCLUSION

For the aforementioned reasons, the decision of the district court shall be AFFIRMED.