**RE/MAX INTERNATIONAL, INC., Plaintiff,**

**v.**

**SMYTHE, CRAMER COMPANY, Defendant.**

**No. 1:03–CV–040.**

United States District Court, N.D. Ohio, Eastern Division.

May 20, 2003.

Mark J. Andreini, Jones, Day, Reavis & Pogue, Cleveland, for Re/Max International, Inc., (pla).

Daniel H. Bromberg, Jones Day, Washington, DC, for Re/Max International, Inc., (pla).

Leslie W. Jacobs, Thompson Hine, Cleveland, for Smythe, Cramer Company, (dft).

Robert C. Jones, Jones, Day, Reavis & Pogue, Washington, DC, for Re/Max International, Inc., (pla).

Charles M. Kennedy, IV, Jones Day, Cleveland, for Re/Max International, Inc., (pla).

Matthew E. Liebson, Thompson Hine, Cleveland, for Smythe, Cramer Company, (dft).

Isla M. Luciano, Jones, Day, Reavis & Pogue, Cleveland, for Re/Max International, Inc., (pla).

Terence R. Quinn, Quinn, Day & Barker, Rapid City, SD, for Re/Max International, Inc., (pla).

Stephen G. Sozio, Jones Day, Cleveland, for Re/Max International, Inc., (pla).

Stephen J. Squeri, Jones, Day, Reavis & Pogue, Cleveland, for Re/Max International, Inc., (pla).

Robert F. Ware, Thompson Hine, Cleveland, for Smythe, Cramer Company, (dft).

## ORDER

GWIN, District Judge.

On February 28, 2003, Defendant Smythe, Cramer Company ("Smythe, Cramer") moved the Court to dismiss Plaintiff RE/MAX International, Inc.'s ("RE/MAX") complaint against it. RE/MAX's complaint makes claims for breach of contract, tortious interference with prospective business relationships, defamation, and antitrust violations. RE/MAX also seeks declaratory relief.

Smythe, Cramer says that the Court should dismiss the entire complaint for failure to state a claim upon which the Court can grant relief. RE/MAX opposes the motion.

For the reasons that follow, the Court grants Smythe, Cramer's motion in part and denies it in part. The Court dismisses the defamation and declaratory judgment claims. Additionally, the Court dismisses the state and federal antitrust claims alleging a section 1 conspiracy between Smythe, Cramer and its current and former agents. However, the Court denies the motion as to the breach of contract and tortious interference with prospective business relationships claims.

### I. Background

The underlying action involves a dispute between residential real estate brokers. Defendant Smythe, Cramer operates as a real estate brokerage firm doing business in northeast Ohio. Plaintiff RE/MAX franchises real estate brokerage systems throughout the United States and North America. In its operation, RE/MAX employs a somewhat different business structure from most real estate franchisors. RE/MAX uses a 100% Concept. Under the 100% Concept, real estate agents keep 95% to 100% of their commissions. Traditional real estate agents historically only keep 50% of their commissions. In exchange for the higher commission rate,

RE/MAX agents pay monthly fees to the RE/MAX brokers with whom they affiliate for office space and other overhead expenses that traditional brokers absorb. RE/MAX agents also pay an annual membership fee to RE/MAX. Besides the higher commission rate, RE/MAX gives its agents access to RE/MAX's referral network, training, corporate relocation services, website, extranet site, software, and other technological tools. Additionally, RE/MAX agents may use the RE/MAX trademark, logo, and service marks.

### 1994 RE/MAX Litigation

In 1994, RE/MAX, its regional subfranchisor, and several franchisees in northeast Ohio sued Smythe, Cramer and Realty One for antitrust violations stemming from the defendants' imposition of adverse commission splits on RE/MAX brokers. With adverse splits, Smythe, Cramer and Realty One split commissions differently with RE/MAX affiliated agents who brought purchasers to a home sale with a Smythe, Cramer or Realty One listing. Lacking direct evidence that Smythe, Cramer and Realty One had tacitly agreed to mutually impose the adverse split formula, RE/MAX relied upon an economic analysis that collusion between Smythe, Cramer and Realty One necessarily occurred because a unilateral imposition of adverse splits would be self-defeating. See *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009–1010 (6th Cir.1999) (discussing RE/MAX expert Martin's opinion that "if Smythe Cramer had no assurance that Realty One would also adhere to adverse splits against RE/MAX, the danger of unilateral imposition would have outweighed the potential loss of agents.") Stated otherwise, RE/MAX took the position that Smythe, Cramer needed the complicity of Realty One to enforce the adverse split policy against RE/MAX. Otherwise, Smythe, Cramer would lose

money as RE/MAX affiliated agents steered their purchasing clients to listings without adverse splits. After a complicated pre-trial path that included a grant of summary judgment, a court of appeals reversal, and a mistrial, the case approached trial. Shortly before a new trial and in July 2000, RE/MAX reached a settlement agreement with Smythe, Cramer and Realty One.

Under the settlement agreement, Smythe, Cramer generally retained the ability to impose adverse splits on RE/MAX brokers for reasons applied to other brokers northeast Ohio area. But under the settlement, Smythe, Cramer could "not issue any special notice letter to a RE/MAX broker based expressly or in purpose, upon (i) its affiliation with RE/MAX International and/or (ii) its use of the RE/MAX business model."

The settlement agreement also includes an agreement to resolve disputes with arbitration. Under the agreement, any RE/MAX broker that receives a special notice letter may demand arbitration. The dispute resolution agreement specifies arbitration procedures and expressly states that the agreement's procedures are the exclusive means to resolve any claims arising from a special notice letter. Although RE/MAX and Smythe, Cramer are parties to the resolution agreement, only Smythe, Cramer and certain RE/MAX brokers are parties to the arbitration agreement. RE/MAX itself is not.

### Smythe, Cramer's Adverse Split Policy & Special Notice Letters

In February 2001, Smythe, Cramer adopted a policy of issuing special notice letters and imposing adverse splits based upon the percentage of former Smythe, Cramer agents working for a broker. Based on this policy, Smythe, Cramer issued special notice letters advising of adverse splits to several brokers, including RE/MAX franchisees. One RE/MAX broker, RE/MAX Premier Properties, successfully arbitrated the special notice letter. In other cases, RE/MAX brokers demanded arbitration, but Smythe, Cramer withdrew its special notice letter before arbitration proceedings began.

In December 2002, Smythe, Cramer withdrew the policy for review and revision. Smythe, Cramer has issued no special notice letters and has not imposed any adverse splits since withdrawing the policy.

RE/MAX sues Smythe, Cramer. With its complaint, RE/MAX sets forth claims for breach of the settlement agreement, tortious interference with prospective business relationships, defamation, violations of the Sherman Act and Ohio Valentine Act, and declaratory judgment.

On February 28, 2003, Smythe, Cramer moved the Court pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss RE/MAX's entire complaint. (Doc. 17). RE/MAX opposes the motion.

On April 30, 2003, RE/MAX moved the Court to amend its complaint to "further particularize the bases for its claims and causes of action; add a prayer for injunctive relief for breach of contract; and add a cause of action for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, based on substantially the same underlying conduct alleged in the original Complaint."

### II. Standard & Analysis

#### A. Standard

The Court uses the Fed.R.Civ.P. 12(b)(6) standard to judge the legal sufficiency of a claim. Under this rule, the Court presumes that all well pleaded allegations are true, resolves all doubts and inferences in favor of the pleader, and views the pleading in the light most favorable to the non-moving party. *Cent.*

*States, Southeast & Southwest Areas Pension Fund v. Mahoning Nat'l Bank,* 112 F.3d 252 (6th Cir.1997). *See also In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir.1997) (holding that when ruling on a motion to dismiss for failure to state a claim, the court deems as admitted all factual allegations made by plaintiff, and the court must construe all ambiguous allegations in plaintiff's favor.) Courts will dismiss a claim under this rule only if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Advocacy Org. For Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, (6th Cir.1999).

### B. Analysis

With its original complaint, RE/MAX makes six claims against Smythe, Cramer.[1] Count I alleges that Smythe, Cramer has breached the settlement agreement by creating and carrying out a prohibited adverse split policy. Count II asserts a claim for tortious interference with contractual relation and complains that Smythe, Cramer's implementation of the adverse split policy interfered with RE/MAX's potential relationships with franchisees and sales agents. Next, RE/MAX claims that Smythe, Cramer defamed RE/MAX by publishing a statement made by Jim Gilreath concerning lien practices and rental provisions of RE/MAX franchisees. With its fourth and fifth charges, RE/MAX says that Smythe, Cramer conspired with its current and former real estate agents for them not to become RE/MAX agents or franchisees. According to RE/MAX, this conspiracy violates Section 1 of the Sherman Act and the Ohio Valentine Act. Finally, Count VI of the complaint seeks a declaratory judgment that if Smythe,

Cramer coerced RE/MAX brokers to boycott the recruiting of Smythe, Cramer's agents, such a boycott violates the antitrust laws.

Smythe, Cramer asks the Court to dismiss all of RE/MAX's claims against it. It seeks dismissal on six grounds. First, Smythe, Cramer says that RE/MAX cannot sue it directly for an alleged breach of the settlement agreement. According to Smythe, Cramer, RE/MAX must either file a motion to enforce the settlement agreement or leave the resolution of the dispute to RE/MAX franchisees. Next, it challenges whether RE/MAX has sufficiently plead the elements of a tortious interference claim. As to the defamation charge, Smythe, Cramer contends that RE/MAX did not set forth with sufficient specificity the allegedly defamatory statements. Alternatively, it argues that the allegedly defamatory statements are not about RE/MAX. Smythe, Cramer also asserts that RE/MAX makes legally insufficient state and federal section 1 antitrust claims because they do not set forth a conspiracy or concerted action. Finally, Smythe, Cramer avers that RE/MAX's declaratory judgment claim is an improper request for an advisory opinion.

The Court examines each argument below.

### 1. Breach of Contract

Smythe, Cramer asks the Court to dismiss RE/MAX's breach of contract claim for three reasons. First, Smythe, Cramer argues that RE/MAX cannot directly challenge Smythe, Cramer's adverse split policy. According to Smythe, Cramer, RE/MAX agreed in the settlement agreement to be a bystander, leaving any challenges to its franchisees. It points to the dispute

---

1. In its amended complaint, RE/MAX adds a seventh claim, a Section 2 antitrust claim. Because Smythe, Cramer's motion to dismiss does not address this claim, the Court does not examine it.

resolution procedure and RE/MAX's lack of an explicit right, under that agreement, to demand arbitration as support.

Alternatively, Smythe, Cramer asserts that, even if RE/MAX has any right to pursue any alleged violations of the settlement agreement, RE/MAX may not sue Smythe, Cramer in a new proceeding. Instead, Smythe, Cramer says that RE/MAX must move to enforce the settlement agreement in the earlier case. Smythe, Cramer says that two grounds support this argument. First, Smythe, Cramer claims that because this Court has continuing jurisdiction over the settlement agreement, RE/MAX must bring any challenge to the settlement agreement as a motion to enforce that agreement. Additionally, Smythe, Cramer argues that the dispute resolution procedure, which is the franchisees' exclusive mechanism to resolve disagreements about the adverse split policy, also binds RE/MAX. Therefore, Smythe, Cramer contends that RE/MAX contractually forbore any right to sue Smythe, Cramer.

Finally, Smythe, Cramer insists that even if RE/MAX may sue, Smythe, Cramer's actions do not constitute a breach of contract as a matter of law.

For the reasons discussed below, these arguments fail to persuade the Court.

### a. Effect of Settlement Agreement on RE/MAX's Ability to Challenge Adverse Split Policy

██ The settlement agreement does not bar RE/MAX from directly challenging Smythe, Cramer's adverse split policy. First, no provisions in the settlement agreement says that RE/MAX expressly agreed that challenges to adverse splits would take place only through arbitration. The agreement does not give RE/MAX the right to arbitrate disputes over the adverse split policy.[2] Having not provided RE/MAX with a right to arbitrate disputes over adverse splits imposed upon its affiliated brokers, it does not follow that RE/MAX has no other means to challenge alleged violations of the settlement agreement.

Second, the settlement agreement contains no provisions that prohibit RE/MAX from suing Smythe, Cramer directly for such alleged violations. It contains a dispute resolution provision that waives the *franchisees'* right to alternative relief. But RE/MAX is not a party to the dispute resolution agreement. The dispute resolution's waiver provision provides, "The *parties* irrevocably waive any and all rights to adjudicate any objection or claim arising from a special notice letter in any forum other than the proceedings described in this Dispute Resolution Agreement." Dis-

---

**2.** The settlement agreement expressly provides that "[a]ny RE/MAX *broker* receiving a special notice letter may demand arbitration pursuant to the Dispute Resolution Agreement." Settlement Agreement ¶ 7c (emphasis added). The settlement agreement defines the term RE/MAX broker:

'RE/MAX broker' shall mean any residential real estate brokerage firm (i) operating, at present or in the future, under a franchise agreement with RE/MAX International or a regional subfanchisor of RE/MAX International (ii) in the Northeast Ohio area. Without otherwise limiting this definition, and subject to the following sentence, the

Franchisee Plaintiffs are included within the scope of the term 'RE/MAX Broker' for the periods during which they operated or operate under their respective franchise agreements.

Settlement Agreement ¶ 1c. The settlement agreement defines Franchisee Plaintiffs as McGrew Realty, Inc., Property Professionals, Inc., T.M.A.T.N.B., Inc., A.E.B.T.S., Inc. Joseph P. Grady, Inc., D.F.I., Inc., Zames Realty, Inc., Advantage Realty, Inc., Realty Properties, Inc., R.E.P., Inc., and True Independents Partnership. Settlement Agreement at 1.

pute Resolution Agreement ¶ 7 (emphasis added). It further states, "the Settlement Agreement contemplates and requires that *certain parties* enter into this Dispute Resolution Agreement." *Id.* (emphasis added). Finally, the dispute resolution agreement expressly lists the parties to it as "Property Professionals, Inc., T.M.A.T.N.B., Inc., A.E.B.T.S., Inc., D.F.I., Inc., [collectively RE/MAX franchisees] and Smythe, Cramer Co." Dispute Resolution Agreement at 1.

Further, the settlement agreement's integration of the dispute resolution agreement does not bind RE/MAX to the dispute resolution waiver. As incorporated in the settlement agreement, the dispute resolution provision binds only RE/MAX's independent brokers, not RE/MAX itself. Regarding the applicability of the dispute resolution agreement, the settlement agreement states:

> The provisions of and procedures described by the Dispute Resolution Agreement *shall be applicable,* until its expiration, to any current or future RE/MAX *Broker,* and no RE/MAX *Broker* may assert any claim or cause of action arising from a special notice letter except to enforce the provisions of this Settlement Agreement, the Dispute Resolution Agreement or an arbitration award under it.

Settlement Agreement ¶ 7d (emphasis added).

Therefore, the terms of the settlement agreement do not stop RE/MAX from bringing its own challenge.

### b. Motion to Enforce Settlement Agreement

RE/MAX is also not limited to bringing a motion to enforce as a means to resolve its objections to Smythe, Cramer's adverse split policy. As discussed, the settlement agreement does not stop RE/MAX from suing Smythe, Cramer in a new proceeding. Further, Smythe, Cramer does not

explain how the Court's consideration of RE/MAX's breach of contract claim in the instant action differs from the Court's consideration of RE/MAX's breach of contract claim in an action labeled "motion to enforce." It also does not explain how the Court's continuing jurisdiction over the settlement agreement stops RE/MAX from suing Smythe, Cramer. Moreover, at the April 16, 2003, conference between the Court and the parties, the Court stated that it would join RE/MAX's current action with Smythe, Cramer's recently filed motion to enforce. Therefore, RE/MAX makes a breach of contract claim in both this action and as part of the motion to enforce.

### c. Breach of Contract As a Matter of Law

Finally, Smythe, Cramer fails in its argument that RE/MAX can prove no set of facts in support of the claim that would entitle it to relief. RE/MAX generally gives three theories of breach: 1) that Smythe, Cramer improperly instituted its February 2001 policy to deter agents from affiliating with RE/MAX; 2) that Smythe, Cramer has "targeted" RE/MAX franchisees and has investigated the "current and historical backgrounds" affiliated with RE/MAX franchisees; and 3) that Smythe, Cramer breached the settlement agreement by announcing its intention to issue a special notice letter to a particular RE/MAX franchisee. As to the first theory of breach, Smythe, Cramer says that the settlement agreement does not bar it from instituting a policy that unintentionally deters agents from affiliating with RE/MAX if the policy applies to all real estate brokers in northeast Ohio. It also says that the second alleged breach fails as a matter of law. According to Smythe, Cramer, no contractual prohibition exists to stop Smythe, Cramer from determining whether a RE/MAX franchisee has hired

Smythe, Cramer agents and responding with a policy applicable to all brokers, not just RE/MAX brokers. Finally, Smythe, Cramer contends that nothing in the settlement agreement stops it from declaring that it intends to send a special notice letter to a franchisee.

Smythe, Cramer misplaces its arguments. The crux of RE/MAX's complaint is not that Smythe, Cramer's policy had the effect of deterring affiliation with RE/MAX. Instead, the complaint alleges that Smythe, Cramer specifically created the February 2001 policy "to target RE/MAX franchisees in northeast Ohio" and to "penalize RE/MAX franchisees for using the RE/MAX business model." Additionally, the complaint alleges that Smythe, Cramer carried out the February 2001, policy in a discriminatory manner. Therefore, resolution of RE/MAX's breach of contract claim requires a determination whether Smythe, Cramer applied its policy inconsistently. RE/MAX may have evidence that other brokers poached Smythe, Cramer agents but were not subjected to the adverse split policy. However, the Court cannot make this factual determination at the pleading stage. RE/MAX's amended complaint does not alter this conclusion.

In sum, the Court finds that the settlement agreement and its accompanying dispute resolution agreement do not stop RE/MAX from suing Smythe, Cramer for breach of contract. The Court also concludes that RE/MAX's breach of contract claim does not fail as a matter of law.

### 2. Tortious Interference With Business Relationship

Smythe, Cramer also contends that the tortious business interference charge does not state a claim upon which the Court can grant relief. It offers three grounds in support of this assertion. First, Smythe, Cramer says that the complaint does not sufficiently plead causation and intent, or identify the prospective relationships with which Smythe, Cramer allegedly interfered. Next, Smythe, Cramer alleges that RE/MAX does not have sufficient contractual relations with its agents. Instead, Smythe, Cramer claims that real estate agents are independent contractors who affiliate themselves with RE/MAX franchisee brokers. Finally, Smythe, Cramer argues that the alleged interference was justified.

For the reasons that follow, these arguments do not prevail.

#### a. Specificity of Pleadings

■ Ohio law recognizes both tortious interference with a business relationship and tortious interference with contract rights claims. *See A & B–Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 651 N.E.2d 1283, 1294 (1995). The claims differ only in that the former tort does not require proof of a contractual relationship. *See id.* "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *Id.*

■ Smythe, Cramer challenges the specificity of RE/MAX's tortious interference pleadings in three respects. First, Smythe, Cramer asserts that a plaintiff at the pleading stage must allege the existence of a specific business relationship. It relies on *Chrvala v. Borden* for this assertion. Next, Smythe, Cramer says that RE/MAX cannot prove "but for" causation because it has not identified a specific relationship that Smythe, Cramer has damaged. Finally, Smythe, Cramer claims that RE/MAX has not sufficiently alleged Smythe, Cramer's intent.

As an initial matter, the Federal Rules of Civil Procedure, not state rules, govern the adequacy of the pleading. While state law governs the substantive resolution of the claims, the sufficiency of the pleadings is a matter of "procedure," not "substance," and federal law governs it. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 747–51, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980); *Lones v. Detroit, T. & I.R. Co.*, 22 Ohio Misc. 115, 398 F.2d 914, 917–18 (6th Cir. 1968).

Pleading under the Federal Rules "is designed to give notice to the Court and other parties of the nature of the action and the relief sought." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). In keeping with this purpose, a complaint need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a).

RE/MAX's tortious interference claim sufficiently meets this pleading requirement. First, RE/MAX's allegations that Smythe, Cramer interfered with its potential relationships with prospective RE/MAX agents and franchisees sufficiently identify the business relationship at issue. *See United States Med. Corp. v. M.D. Buyline, Inc.*, 753 F.Supp. 676, 681 (S.D.Ohio 1990) (holding that complaint alleging tortious interference was not subject to 12(b)(6) dismissal where it alleged that the defendant detrimentally affected the plaintiff's relationships with its clients although the complaint did not describe any particular situation where the defendant interfered with a business relationship); *see also Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1279 (10th Cir. 2000) (holding allegations of interference with "consumers, distributors, and other customers" sufficient at the pleadings stage); *Cook v. Winfrey*, 141 F.3d 322, 328

(7th Cir.1998) ("The Federal Rules do not require that [a plaintiff claiming tortious interference] allege the specific third party or class of third parties with whom he claims to have had a valid business expectancy.").

Smythe, Cramer's reliance on *Chrvala* does not alter the Court's analysis. The *Chrvala* court granted summary judgment to the defendant because the plaintiff produced no evidence that would show "but for" causation. *Chrvala v. Borden, Inc.*, 14 F.Supp.2d 1013, 1023 (S.D.Ohio 1998). However, the court did not say anything about the need to allege the existence of a specific contractual relationship at the pleading stage. *Id.* Besides *Chrvala*, Smythe, Cramer cites no other authority for this proposition. Nor has the Court found any such legal authority.[3]

Further, the Sixth Circuit, applying Michigan law, has held that a plaintiff need only identify a specific class of prospective third parties to establish a tortious interference claim. *Lucas v. Monroe County*, 203 F.3d 964, 979 (6th Cir.2000). Here, RE/MAX has identified the specific class of prospective RE/MAX agents and franchisees. Moreover, the *Lucas* decision involved the proof required in a summary judgment proceeding. *Id.* The *Lucas* court did not suggest that a plaintiff need identify a specific class of third parties at the pleading stage. *Id.* But even if a plaintiff must identify a specific class at the pleading stage, RE/MAX has done so.

Additionally, Smythe, Cramer's causation argument does not succeed. RE/MAX does not need to prove causation at the pleading stage. While it may fail at summary judgment or at trial, it must, at this stage, only allege a "short and plain statement of the claim showing that the

---

3. Even if Ohio law governed the pleading requirements of a tortious interference claim, the Court has found no Ohio authority requiring the pleading of a specific relationship.

pleader is entitled to relief." Fed.R.Civ.P. 8(a). It has done so for the causation element. Specifically, RE/MAX avers that Smythe, Cramer's conduct "[has] and and will continue to cause prospective franchisees and sales agents who otherwise would have become RE/MAX franchisees or agents to decline to do so." Compl. ¶ 70; Am. Compl. ¶ 74. As for the intent element, RE/MAX asserts that Smythe, Cramer intended to interfere with RE/MAX's potential business relationships. *See* Compl. ¶¶ 66, 68, 69; Am. Compl. ¶¶ 69, 71, 72. This satisfies the Federal Rules' liberal pleading requirements.

b. Sufficient Business Relationships

Smythe, Cramer also complains that RE/MAX cannot state a valid tortious interference claim because Smythe, Cramer says that RE/MAX does not have sufficient contractual relations with its sales agents.

Smythe, Cramer is incorrect. RE/MAX alleges that Smythe, Cramer interfered with "RE/MAX's business relations with *franchisees* and potential business relations with potential *franchisees*." Am. Compl. ¶ 46. RE/MAX and its franchisees have contractual relations. Also, RE/MAX and RE/MAX agents have a business relationship in that RE/MAX agents pay RE/MAX annual membership fees.

Therefore, the Court concludes that RE/MAX has sufficient business relationships with its agents and franchisees to support a tortious interference claim.

c. Privilege

■ Finally, Smythe, Cramer argues that RE/MAX fails to show that Smythe, Cramer's actions are not privileged or justified.

A defendant may assert a qualified privilege in tortious interference cases. *Doyle v. Fairfield Mach. Co., Inc.,* 120 Ohio App.3d 192, 218, 697 N.E.2d 667, 683–84 (1997). However, the plaintiff in a tortious

interference action has the burden to show that a defendant's actions are neither justified nor privileged. *See Super Sulky, Inc. v. United States Trotting Ass'n,* 174 F.3d 733, 742 (6th Cir.1999) (citations omitted). To overcome a defendant's assertion that a qualified privilege exists, the plaintiff must show, by clear and convincing evidence, that the defendant acted with malice. *Doyle,* 120 Ohio App.3d at 218, 697 N.E.2d at 683–84 (citing *A & B–Abell Elevator Co., Inc.,* 73 Ohio St.3d at 11–12, 651 N.E.2d at 1292–93). The Court has significant doubts that the plaintiff can make this showing. Smythe, Cramer has a legitimate business interest in preventing RE/MAX from raiding its agents. However, the plaintiff does not need to prove this lack of justification at the pleading stage. As the Supreme Court noted:

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Here, the tort of interference with existing contractual relations requires: 1) the existence of the prospect of a business

relationship; 2) the defendant's knowledge of the plaintiff's prospective relationship; 3) the defendant's intentional and material interference with the plaintiff's prospective relationship; 4) the lack of justification; 5) a showing that but for the alleged interference, the plaintiff would have consummated the prospective relationship; and 6) resulting damages. *See, e.g., Chrvala*, 14 F.Supp.2d at 1023; *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995).

In its complaint, RE/MAX has sufficiently alleged these elements, including the lack of justification. Specifically, RE/MAX avers that Smythe, Cramer' conduct "is not privileged because of [Smythe, Cramer's] use of wrongful means in its interference and also because its action creates and/or constitutes an unlawful restraint of trade." Therefore, a 12(b)(6) dismissal of the tortious interference claim is inappropriate.

### 3. Defamation

■ Next, Smythe, Cramer alleges that RE/MAX has not stated a claim for defamation. It rests this assertion on two grounds. First, Smythe, Cramer contends that to state a claim for defamation, a plaintiff must quote the allegedly defamatory statement or set forth the statement "substantially in the language uttered." According to Smythe, Cramer, RE/MAX has not done so. Second, Smythe, Cramer asserts that the allegedly defamatory statements do not relate to RE/MAX.

The Court examines each argument below.

#### a. Substance of the Defamatory Statement

Smythe, Cramer's argument that RE/MAX must quote the allegedly defamatory statement does not win. First, the amended complaint does quote some of the allegedly defamatory statements. Am. Compl. ¶ 78. Even without the amendments, RE/MAX's averments about the substance of the statements were legally sufficient. The Federal Rules do not impose any special pleading requirements on defamation claims. *See* Fed.R.Civ.P. 9 (listing matters of special pleading but omitting defamation); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (holding that Rule 9's special pleading requirements are exclusive). Moreover, the Sixth Circuit has rejected the common law specialized pleading requirements for defamation, holding instead that the more liberal federal pleading requirements apply. *Suarez Corp. v. CBS, Inc.*, 23 F.3d 408, 1994 WL 142785, at *5 (Table) (6th Cir. Apr.19, 1994) ("While technical rules of pleading existed for defamation at common law, the liberalized requirements of the federal rules only require 'notice pleading.'"). *See also Baxter Travenol Labs., Inc. v. LeMay*, 93 F.R.D. 379, 381 (S.D.Ohio 1981) (rejecting suggestion that "the precise words [of an allegedly defamatory statement] need [to] be alleged").

RE/MAX's amended complaint avers most of the exact language of the allegedly defamatory statements. Even where RE/MAX's complaint does not set forth the exact language of the allegedly defamatory statement, it identifies the person who made the statement and the general substance of the comments. This gave sufficient even if not complete, notice to the Court and to the parties of the nature of the action and the relief sought. Therefore, RE/MAX adequately pled its defamation claim.

#### b. Of & Concerning RE/MAX

Next, Smythe, Cramer argues that its allegedly defamatory statements do not relate to RE/MAX. Instead, it says the comments concern RE/MAX franchisees.

Whether certain allegedly defamatory statements are actionable is a question of

**894**

law for the court. *Yeager v. Local Union,* 6 Ohio St.3d 369, 372, 453 N.E.2d 666, 669 (1983). Additionally, whether an allegedly defamatory statement was "of and concerning" the plaintiff is a matter of law. *New York Times Co. v. Sullivan,* 376 U.S. 254, 267, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See also Stow v. Coville,* 96 Ohio App.3d 70, 644 N.E.2d 673 (1994).

A corporation may seek damages for defamation to the corporation. *Embers Supper Club, Inc. v. Scripps–Howard Broad. Co.,* 9 Ohio St.3d 22, 457 N.E.2d 1164 (1984). However, a plaintiff in a defamation action, whether an individual or a corporation, must not only prove that a statement is defamatory, but also that the statement defames the individual or entity. *Sethi v. WFMJ Television, Inc.,* 134 Ohio App.3d 796, 812, 732 N.E.2d 451, 462 (Ohio Ct.App. 7th Dist.1999). A plaintiff cannot recover damages by establishing that the defendant has defamed another person or entity. *Dinkel v. Lincoln Publ'g, Inc.,* 93

Ohio App.3d 344, 347, 638 N.E.2d 611, 613–14 (1994). Here, each of the allegedly defamatory statements concern RE/MAX brokers, not RE/MAX.[4] Moreover, the statements concern the office rental provisions between RE/MAX brokers and agents and alleged lien provisions between RE/MAX brokers and agents. RE/MAX is a franchisor, not a broker or agent. Therefore, the statements do not concern RE/MAX.

RE/MAX does not dispute that the statements are about RE/MAX brokers. Instead, it claims that a defamatory statement about RE/MAX brokers reflects adversely upon the RE/MAX system as a whole. Specifically, in its amended complaint, RE/MAX states:

> In publishing the statement, which refers generically to a RE/MAX company and to purported practices throughout the United States or North America, Defendant intended it to mean and to convey that the described methods of

---

[4.] On dates in 2002 and other times unknown, Defendant published a statement authored by Jim Gilreath that contains "questions to ask when talking with a RE/MAX Company." These questions, which are "designed to stop agents from going to RE/MAX," disparage the business practices in the RE/MAX network, thereby defaming RE/MAX and injuring its business reputation. Said statement is false and misleading in the following respects, among others:

(a) The statement falsely suggests that contracts between RE/MAX brokers and RE/MAX agents typically have provisions allowing the broker to put a lien on the agent's home if the broker claims that the agent owes the broker money. For example, the statement urges agents to say that they have "heard that with most of your company's contracts there are provisions where you can put a lien on my home if you claim that I owe you money." It also urges agents to ask "Does your contract specifically state the terms and conditions of what you could do to me if you decide to put a lien on my home?" and "Have you or any of the other local offices ever put a lien on someone's home?"

(b) The statement falsely suggests that contracts between RE/MAX brokers and RE/MAX agents have onerous rental provisions with unfair notice provisions and harsh penalties. For example, the statement urges agents to say "I've heard that the only way that I can be released from your mandatory twelve month contract is with a sixty day written notice from me to you that I'm leaving" and "If I were to leave immediately after notifying you, why would you force me to pay sixty days rent if I'm not here?"
(c) The statement falsely suggests that many RE/MAX offices in North America provide six months free shared office expenses and that this is a standard item in such contracts. For example, the statement urges agents to say "I've heard that in many locations throughout North America, agents are receiving as much as six months free shared office expenses. Since many companies are doing this, will you do this for me?" Because RE/MAX brokers do not routinely offer such free expenses, this statement falsely implies that agents who do not receive such offers are being treated unfairly or with a lack of candor.
Am. Compl. ¶ 78.

practice are endorsed and propagated by RE/MAX. The persons to whom the defamatory matter was communicated understood Defendant's words to have such meaning.

Am. Compl. ¶ 82.

Further, it says the comments, by implication, adversely impact RE/MAX as the developer of that system. RE/MAX cites two cases, *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Servs.*, and *Philadelphia Newspapers, Inc. v. Hepps,* as support for the proposition that a franchisor may maintain a defamation action based on allegedly defamatory statements made about its franchisee.

These cases are inapposite. In *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Supreme Court allowed a franchisor to bring a defamation claim along with a franchisee for defamatory statements specifically made about *both* the franchisor and the franchisee. *Id.* Similarly, in *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Servs.,* 81 Ohio App.3d 591, 611 N.E.2d 955 (1992), the court allowed both a corporation and its principal to pursue a defamation claim where the statements *specifically* identified *both* the corporation and the principal. *Id.*

Here, RE/MAX admits that the comments "refer generically to a RE/MAX company." Am. Compl. ¶ 82. That company is not RE/MAX because the statements refer to the relationship between a RE/MAX broker and agent. RE/MAX is a franchisor, not a broker or agent. Cursorily alleging that the persons to whom the statements were made understood RE/MAX to endorse the practices is not sufficient to make the statements "of and about" RE/MAX.

In sum, although RE/MAX does adequately plead the substance of the allegedly defamatory statements, it does not adequately plead that the statements were of

and concerning RE/MAX. Therefore, RE/MAX's complaint does not state a cause of action for defamation.

### 4. Sherman Act

Next, Smythe, Cramer asserts three challenges to RE/MAX's federal antitrust claim. First, it alleges that RE/MAX has failed to sufficiently plead the details of its conspiracy claim. Next, Smythe, Cramer says that RE/MAX, as a matter of law, does not state a claim for conspiracy. It offers two bases of support for this position. First, Smythe, Cramer avers that under the intra-corporate doctrine, it is legally incapable of conspiring with its agents. Second, Smythe, Cramer contends that its alleged conspiratorial conduct is permissible unilateral action. Finally, Smythe, Cramer challenges whether RE/MAX has antitrust standing because it says RE/MAX has suffered no antitrust injury.

For the reasons that follow, the Court finds that RE/MAX failed to plead sufficient information as to the participants, time, place, and effect of the conspiracy. Further, even if RE/MAX had made a legally sufficient conspiracy allegation, Smythe, Cramer is legally incapable of conspiring with its current agents. As to its former agents, RE/MAX does not set forth any concerted action. Finally, RE/MAX has not made a sufficient claim of anticompetitive effects.

The Court examines each argument below.

#### a. Legally Insufficient Averments

First, Smythe, Cramer claims that RE/MAX failed to plead sufficient information as to the time, place, and alleged effect of the conspiracy. According to Smythe, Cramer, RE/MAX has instead made a legally insufficient bare allegation of conspiracy.

A plaintiff must allege the elements of a Section 1 claim in more than "vague and conclusory terms" to survive a defendant's 12(b)(6) motion. *See Hohensee v. Akron Beacon Journal Publ'g Co.,* 174 F.Supp. 450, 452 (N.D.Ohio 1959), *aff'd,* 277 F.2d 359 (6th Cir.1960), *cert. denied,* 364 U.S. 914, 81 S.Ct. 277, 5 L.Ed.2d 227 (1960). Therefore, a plaintiff's bare allegation of conspiracy is insufficient to sustain an antitrust claim. *See Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 221 (4th Cir.1994) (noting that "it is not enough merely to state that a conspiracy has taken place," but that a plaintiff must allege "some details of the time, place and alleged effect of the conspiracy").

Here, RE/MAX has not set forth sufficient allegations about the details of the participants, time, place, and effect of the alleged conspiracy. RE/MAX does not provide any details as to who participated in the conspiracy beyond asserting that Smythe, Cramer conspired with current and former agents. RE/MAX does not identify any agent that Smythe, Cramer allegedly coerced or provide any details as to the alleged agreement. Instead, RE/MAX cursorily alleges that Smythe, Cramer has "coerced and otherwise induced Northeast Ohio residential real estate agents, including present and former residential real estate sales agents of Defendant to agree to refrain from becoming" RE/MAX agents or otherwise affiliate with RE/MAX.[5] Am. Compl. ¶ 47. As to the time of the conspiracy, RE/MAX tersely identifies the time as "[s]ince at least February 2001." Am. Compl. ¶ 47. RE/MAX further avers that the effect of the alleged conspiracy is the "reduced and eliminated competition for the sale and selling of residential real estate, as well as for the recruitment and retention of experienced and knowledgeable residential real estate sales agents, and … limited … ability of RE/MAX to sell franchises and limited … growth of RE/MAX franchises." Am. Compl. ¶ 47.

As to the place of the conspiracy, the complaint alleges that the "unlawful acts … have occurred in, and have affected commerce in, relevant geographic markets in Northeastern Ohio, including the eastern suburbs of Cleveland, Ohio (consisting of parts of Cuyahoga, Geuga [sic], Summit, Lake and Portage Counties) and submarkets thereof." Am. Compl. ¶ 52.

These vague averments do not suffice. Therefore, RE/MAX has not set forth sufficient details of the alleged conspiracy to survive a 12(b)(6) motion to dismiss.

### b. Intra–Corporate Doctrine

Assuming that RE/MAX did plead sufficient information as to the details of the conspiracy, Smythe, Cramer next argues that, under the intra-corporate doctrine, it is legally incapable of conspiring with its current and former sales agents.

For the reasons discussed below, Smythe, Cramer is partially correct. The intra-corporate doctrine stops RE/MAX's claim that Smythe, Cramer conspired with its current agents. However, the doctrine does not apply to RE/MAX's charge that Smythe, Cramer conspired with its former agents.

*Alleged Conspiracy Between Smythe, Cramer and its Current Agents*

15 U.S.C. § 1 provides "[e]very contract, combination … or conspiracy, in

---

5. Specifically, the complaint alleges:

Since at least February 2001, Defendant has coerced and otherwise induced Northeast Ohio residential real estate agents, including present and former residential real estate sales agents of Defendant, to agree to refrain from becoming agents of RE/MAX franchisees or franchisees for RE/MAX or otherwise affiliating with RE/MAX or its franchisees.

Am. Compl ¶ 47.

restraint of trade or commerce ... is illegal." To set forth a section 1 violation, a plaintiff must establish "that the defendants contracted, combined or conspired among each other that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy." *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988). Since either conspiracy or restraint of trade is an essential element of a section 1 Sherman antitrust claim, failure to allege either one justifies dismissal of an antitrust claim. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 557 (7th Cir.1980) (insufficient allegations of anticompetitive effect); *Stewart v. Hevelone*, 283 F.Supp. 842, 845 (D.Neb. 1968) (insufficient allegations of conspiracy).

Not every agreement or coordinated conduct between two or more entities is a conspiracy under section 1. For example, the law views a parent corporation and its wholly owned subsidiary as a single enterprise for purposes of section 1 of the Sherman Act, because:

> [t]heir objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Similarly, an agreement between officers or employees of the same firm does not ordinarily constitute a section 1 conspiracy, because:

> officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively....

*Id.* at 769, 104 S.Ct. 2731. For the same reasons, a corporation cannot ordinarily conspire with its agents or employees. *See, e.g., Smith v. Northern Mich. Hosps.*, 703 F.2d 942, 950 (6th Cir.1983). The law calls these rules collectively the "intracorporate conspiracy doctrine." *See, e.g.,* Handler & Smart, *The Present Status of the Intracorporate Conspiracy Doctrine*, 3 Cardozo L.Rev. 23 (1981), *cited in Copperweld*, 467 U.S. at 766 n. 12, 104 S.Ct. 2731.

RE/MAX asserts that the intra-corporate doctrine does not apply to current Smythe, Cramer agents because it claims Smythe, Cramer's sales persons are independent contractors, not agents of Smythe, Cramer. Therefore, it says that Smythe, Cramer and its sales representatives have no unity of interest with respect to the imposition of adverse splits. Alternatively, RE/MAX contends that even if the sales representatives are agents of Smythe, Cramer, they are still capable of conspiring with Smythe, Cramer under the independent personal stake exception.

Neither argument wins. Although the law may classify real estate agents as independent contractors for tax purposes, it does not follow that such agents are independent contractors for antitrust purposes. In fact, under the Ohio real estate licensing system, the nature of the relationship between an agent and broker is more akin to superior and subordinate.

In Ohio, a sales agent must have a license to sell real estate and a licensed real estate agent must affiliate with a broker. Ohio Rev.Code Ann. §§ 4735.09, 4735.13(B), 4735.13(E). Further, a real estate agent collects his commission through the broker with whom he is affiliated. Specifically, Ohio Rev.Code. Ann. § 4735.21 provides:

> No real estate salesman or foreign real estate salesman shall collect any money in connection with any real estate or foreign real estate brokerage transaction, whether as a commission, deposit, payment, rental, or otherwise, except in the name of and with the consent of the licensed real estate broker or licensed foreign real estate dealer under whom he is licensed. Nor shall any real estate salesman or foreign real estate salesman commence or maintain any action for a commission or other compensation in connection with a real estate or foreign real estate brokerage transaction, against any person except a person licensed as a real estate broker or foreign real estate dealer under whom he is licensed as a salesman at the time the cause of action arose.

Therefore, "a licensed real estate salesman has no independent status. He is an associate of a licensed real estate broker, and can only function through the broker with whom he is associated." *Wolf v. Hyman*, 104 Ohio App. 32, 143 N.E.2d 633, 635 (1957).

Based on the above legally required supervision, real estate agents, for antitrust purposes, are employees of the broker with whom they affiliate. Accordingly, the intra-corporate doctrine stops RE/MAX's conspiracy claims involving Smythe, Cramer and its current agents.

The fact that some agents have broker's licenses and are hypothetical competitors of RE/MAX does not alter the Court's conclusion. In addressing a similar employment relationship, the Sixth Circuit has held that the intra-corporate doctrine only applies to a hospital and its medical staff members when the staff member is not a direct competitor of the doctor asserting the section 1 claim. *Nurse Midwifery Assocs. v. Hibbett*, 918 F.2d 605, 614 (6th Cir.1990). However, Smythe, Cramer's present agents are not direct competitors of RE/MAX brokers. In Ohio, a real estate agent must affiliate with a broker to conduct real estate transactions. Further, an agent may only affiliate with one broker at a time. *See* Ohio Rev. Code Ann. §§ 4735.11, 4735.13. Consequently, a current Smythe, Cramer sales agent affiliated with a Smythe, Cramer brokerage firm acts only as a sales agent unless he opts to sever the relationship. Then, he may act as an independent broker. Therefore, he is not a present competitor of RE/MAX. Further, the agent owes a duty of loyalty to the broker with whom he associates. *Wolf*, 143 N.E.2d at 636. Accordingly, current Smythe, Cramer agents with brokers' licenses act as agents under the umbrella of Smythe, Cramer instead of as broker competitors of RE/MAX.

Finally, the independent personal stake exception does not apply as the Sixth Circuit has declined to adopt the exception. *See Nurse Midwifery*, 918 F.2d at 615 ("We are not inclined at this point to follow several other circuits in adopting this exception ... We are not convinced that an agent acting with anticompetitive motives due to some independent personal stake raises sufficient antitrust concerns to warrant abandoning the traditional rule that a principal cannot conspire with one of its agents.")

Therefore, the intra-corporate doctrine applies to stop RE/MAX's conspiracy claims involving Smythe, Cramer and its

current agents. Nothing in RE/MAX's amended complaint alters this analysis.

### Alleged Conspiracy Between Smythe, Cramer and its Former Agents

Although Smythe, Cramer does not expressly say so, it appears to argue that the intra-corporate doctrine also applies to Smythe, Cramer's relations with its former agents. Smythe, Cramer, however, provides no legal authority to support the proposition that it is legally incapable of conspiring with its former agents. The Court has found no such authority. Additionally, in its complaint, RE/MAX makes no allegation that Smythe, Cramer conspired with its former agents while Smythe, Cramer employed them. Instead, the complaint appears to allege that the conspiracy occurred after the agents left Smythe, Cramer's employ. Therefore, the intra-corporate doctrine does not bar RE/MAX's claim that Smythe, Cramer conspired with its former agents.

In sum, RE/MAX's conspiracy claim involving Smythe, Cramer and its current agents does not state a claim upon which the Court can grant relief because Smythe, Cramer is legally incapable of conspiring with its present agents. The intra-corporate doctrine does not apply, however, to Smythe, Cramer and its former agents.

### c. Unilateral Conduct

Alternatively, Smythe, Cramer asserts that RE/MAX's conspiracy claim fails because the alleged conspiratorial conduct was unilateral. Specifically, Smythe, Cramer says that the conduct alleged by RE/MAX to constitute a conspiracy is Smythe, Cramer's issuance of its February 2001, policy. According to Smythe, Cramer, RE/MAX does not allege that Smythe, Cramer consulted or negotiated with anyone about its policy. Therefore, it claims that RE/MAX is complaining about permissible unilateral conduct.

Since the intra-corporate doctrine bars RE/MAX's conspiracy claim involving Smythe, Cramer and its current agents, the Court examines this argument as it applies to the alleged conspiracy between Smythe, Cramer and its former agents.

### Contract, Combination or Conspiracy

To establish a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff "must establish that the defendants combined or conspired with an intent to unreasonably restrain trade." *Northern Mich. Hosps.*, 703 F.2d at 949. "It is crucial that a plaintiff demonstrate that there has been a contract, combination, or conspiracy between separate entities, because section 1 does not reach unilateral conduct even if such conduct unreasonably restrains trade." *Nurse Midwifery Assocs.*, 918 F.2d at 611 (citing *Copperweld Corp.*, 467 U.S. at 768, 104 S.Ct. 2731). Section 2 governs unilateral conduct, and "is unlawful only when it threatens actual monopolization." *Copperweld*, 467 U.S. at 768, 104 S.Ct. 2731. "Under section 1, only after the court has found that there was a conspiracy will it examine whether the conduct was unreasonable." *Nurse Midwifery*, 918 F.2d at 611.

Unilateral imposition of a policy followed by mere acquiescence of others does not state a section 1 claim. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *see also Tarrant Serv. Agency, Inc. v. American Standard, Inc.*, 12 F.3d 609, 617 (6th Cir.1993) (holding that manufacturer of HVAC equipment acted unilaterally where it prohibited independently-owned and company-owned distributors of its parts from selling to independent repair companies), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994). Further, a court may not infer concerted action from the existence of a policy and compliance with the policy

where the policy maker does not need acquiescence to impose the policy. *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904 (6th Cir.1989), (reasoning that concerted action cannot be inferred simply from the existence of a manufacturer's marketing policies and a distributor's compliance with them because manufacturers do not need its distributors' acquiescence to impose such policies), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990).

Here, Smythe, Cramer does not need the acquiescence of its former agents to impose the adverse split policy. Further, the complaint sets forth no allegations that Smythe, Cramer did anything more than unilaterally impose the adverse split policy with the agents merely acquiescing in the policy. RE/MAX does not aver a concrete factual predicate about the conspiracy. RE/MAX does not identify any agent that Smythe, Cramer allegedly coerced or provide any details as to the alleged agreement. Instead, RE/MAX cursorily alleges that Smythe, Cramer has "coerced and otherwise induced" former real estate agents "to agree to refrain from becoming" RE/MAX agents or otherwise affiliate with RE/MAX.[6] Am. Compl. ¶ 47. It also states that Smythe, Cramer "successfully obtained these agreements and refusals to deal." Am. Compl. ¶ 91. Additionally, RE/MAX contends that Smythe, Cramer "coerced and otherwise induced" real estate agents "to enter into a contract, combination, or conspiracy with Defendant in restraint of trade." Am. Compl. ¶ 97. Finally, it states that Smythe, Cramer "has attempted to coerce and otherwise induce, solicit and demand that RE/MAX franchisees agree to limit and refrain from re-cruiting and retaining" Smythe, Cramer's present and former agents. Am. Compl. ¶ 48.

These vague and conclusory allegations of an agreement, without more, do not suffice to state a section 1 claim. The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion. *See Crane & Shovel Sales Corp.*, 854 F.2d at 805. While the pleading standard under the federal rules is very liberal, *see* Fed.R.Civ.P. 8, "the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir.1999) (emphasis omitted).

Therefore, RE/MAX's allegations do not set forth a valid conspiracy claim.

### d. Restraint of Trade

Even if RE/MAX had sufficiently alleged a conspiracy, it failed to aver anticompetitive effects.

The Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states … is hereby declared to be illegal." 15 U.S.C. § 1. Despite the broad language of the statute, it prohibits only unreasonable restraints of commerce or trade. To show unreasonable restraint of trade, the plaintiff must show that the conspiracy has the potential to produce "adverse, anticompetitive effects within relevant product and geographic markets." *Davis–Watkins*

---

**6.** Specifically, the complaint alleges:

> Since at least February 2001, Defendant has coerced and otherwise induced Northeast Ohio residential real estate agents, including present and former residential real estate sales agents of Defendant, to agree to refrain from becoming agents of RE/MAX franchisees or franchisees for RE/MAX or otherwise affiliating with RE/MAX or its franchisees.

Am. Compl ¶ 47.

Co. v. Serv. Merch., 686 F.2d 1190, 1195 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984).

The Supreme Court has set out two kinds of analysis to examine whether agreements run afoul of antitrust laws. The first analysis employs a presumption that an agreement is an antitrust violation, thus invoking a *per se* illegality rule to classify the agreement. The second, called "rule of reason" analysis, "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

*Per se* violations involve "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). *Per se* illegal restraints on trade such as boycotts and price fixing do not require proof of market power. *See FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 432–36, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). The Supreme Court has justified *per se* rules partially because these rules help a court "avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 15–16 n. 25, 104 S.Ct. 1551, 80 L.Ed.2d 2, (1984). *See also Maricopa County Med. Soc'y,* 457 U.S. at 344, 102 S.Ct. 2466 (explaining that "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive pre-

sumption that the restraint is unreasonable").

Under the second kind of analysis, the "rule of reason," the court "evaluate[s] [the agreement] by analyzing the facts peculiar to the business, the history of the restraint, and the reasons it was imposed.... to form a judgment about the competitive significance of the restraint." *Nat'l Soc'y of Prof'l Eng'rs,* 435 U.S. at 692, 98 S.Ct. 1355. In analyzing agreements that are not *per se* violations of the antitrust laws, the court looks to whether the action complained of "has the potential for genuine adverse effects on competition," and this analysis usually involves an inquiry "into market definition and market power." *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). The purpose of this "rule of reason" analysis is to discover " 'whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.' " *Id.* at 458, 106 S.Ct. 2009 (quoting *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)).

Here, although RE/MAX alleged a group boycott by Smythe, Cramer and former agents, the action giving rise to the complaint does not constitute a *per se* violation. RE/MAX does not aver any horizontal agreements among direct competitors. *See NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (holding that *per se* rule in boycott context is limited to cases involving horizontal agreements among direct competitors); *Com–Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982) (holding that though group boycott usually has both vertical and horizontal characteristics, it is horizontal element that justifies applying a rule of *per se* illegality). Instead, RE/

MAX's complaint alleges that Smythe, Cramer deprived RE/MAX of a supply of real estate agents. The *per se* rule is inapplicable to a "restraint that takes the form of depriving a supplier of a potential customer." *NYNEX*, 525 U.S. at 136, 119 S.Ct. 493.

■ Because Smythe, Cramer's activity is not a *per se* antitrust violation, the Court analyzes it according to a rule of reason, which requires RE/MAX to allege and to prove that Smythe, Cramer's action "may suppress or even destroy competition." *Indiana Fed'n of Dentists*, 476 U.S. at 460, 106 S.Ct. 2009; *Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 569–70 (6th Cir.1992). RE/MAX must allege and prove more than its own damages, *see Lie*, 964 F.2d at 570, because the antitrust laws are designed for "the protection of competition, not competitors," *see Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

RE/MAX does not sufficiently allege anticompetitive effects or injury to the public. Instead, it cursorily states that Smythe, Cramer's "scheme was reasonably calculated to, and did, restrain trade and harm competition by excluding RE/MAX and its franchisees from those areas, by inhibiting the growth of RE/MAX and its franchises, by raising costs and barriers to entry, and ultimately by maintaining or limiting the compensation of experienced and successful residential real estate agents." Am. Compl. ¶ 94.

These allegations relate to RE/MAX's injury, not injury to the public. They also do not show restraint of trade. However,

"[r]estraint of interstate commerce and injury to the public must be stated specifically, even under the notice theory of pleading." *Hohensee v. Akron Beacon Journal Publ'g Co.*, 171 F.Supp. 90, 92 (N.D.Ohio 1959) (citations omitted), *aff'd by Hohensee v. Akron Beacon Journal Publ'g Co.*, 277 F.2d 359 (6th Cir.1960).

Additionally, it is unlikely that RE/MAX could set forth allegations of harm to the consumer because Smythe, Cramer's adverse split policy is more likely to harm Smythe, Cramer than the public. In *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009–1011 (6th Cir.1999), the court relied on expert testimony that unilateral imposition of an adverse split policy would not be in Smythe, Cramer's economic interest unless it had assurance that Realty One or other real estate brokers would also impose such a policy. The *Realty One* court explained the expert's testimony as follows:

> For example, a unilateral-splits policy against Re/Max adopted only by Smythe Cramer would keep Smythe Cramer's agents from leaving for *Re/Max*, but it would result in customers and sales agents leaving for *Realty One*. Dr. Martin clearly stated in different ways on a number of occasions that "without coordinated conduct, parallel imposition of adverse splits is implausible." He explained that, in a market with two dominant competitors, the risk of loss of sales agents to a third entrant offering more favorable employment terms is outweighed by the risk of loss of market share if a dominant competitor imposes adverse splits on the new market entrant. For example, one of two dominant competitors (Smythe Cramer) acting rationally will not independently impose adverse splits on a new competitor (Re/Max), because doing so will cause the new competitor to concentrate on supplying buyers to purchase properties

listed by the other dominant competitor (Realty One). Thus, the dominant competitor who does not impose the adverse splits will sell more homes faster, while the other dominant competitor will lose agents and referral business in a downward cycle.

Furthermore, the best of both worlds for *either* dominant competitor is for the *other* to impose the adverse splits against the new entrant. In that situation, the non-imposing competitor obtains a "very high" increase in profits while the imposing competitor sinks to "very low." When both dominant competitors impose adverse splits, both increase their profits, but neither obtains a "very high" increase. Thus, even when one dominant competitor has already adopted adverse splits *on its own* (a "highly unlikely" event in the first place), the other dominant competitor has a strong incentive *not* to do likewise. *Id.* at 1010. Here, RE/MAX makes no allegations that Smythe, Cramer conspired with other brokers in implementing the adverse split policy. Moreover, Dr. Martin's game theory analysis suggests that imposition of adverse splits requires concert with significantly sized collaborators. Agreement with minor brokers would lead to the same loss of agents and business associated with unilateral actions. The fact that Smythe, Cramer acted on its own in implementing the adverse split policy all but forecloses the possibility of harm to the consumer.

In sum, RE/MAX makes no allegation suggesting an injury to competition in the form of increased cost or reduced supply of services or harm to the consumer.

### e. Antitrust Standing

Finally, Smythe, Cramer challenges RE/MAX's standing to bring its antitrust claim. Specifically, it says that RE/MAX has not suffered a cognizable injury and has failed to allege harm to consumers.

Because the Court finds that RE/MAX has failed to sufficiently allege a section 1 claim, it does not reach this issue.

### 5. Valentine Act

Smythe, Cramer also contends that RE/MAX's Ohio antitrust allegation is legally insufficient.

■■■ The Ohio Legislature patterned Ohio's Valentine Act after the Sherman Antitrust Act and, consequently, courts must interpret the Valentine Act in light of federal construction of the Sherman Act. *See C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.,* 63 Ohio St.2d 201, 204, 17 O.O.3d 124, 126, 407 N.E.2d 507, 509 (1980). Therefore, based on the above reasoning in the federal antitrust claims, the Court dismisses the Ohio section 1 conspiracy claims involving Smythe, Cramer and its current and former agents. Nothing in RE/MAX's amended complaint alters this conclusion.

### 6. Declaratory Judgment

■■■ Finally, Smythe, Cramer argues that the declaratory judgment claim fails because no case or controversy exists. According to Smythe, Cramer, the only claimed basis for relief is the hypothetical future joining of other brokers to create a boycott.

Smythe, Cramer is correct. With its complaint and amended complaint, RE/MAX alleges that Smythe, Cramer is trying to coerce RE/MAX brokers into boycotting the recruiting of Smythe, Cramer agents. RE/MAX seeks a declaration that such a boycott would violate the antitrust laws.

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested par-

ty seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201 (emphasis added). The decision to hear a declaratory judgment claim is discretionary. *Found. for Interior Design Educ. Research v. Savannah College of Art & Design,* 244 F.3d 521, 526 (6th Cir.2001). Moreover, federal courts are "empowered to entertain declaratory judgment actions only where a party alleges facts that 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality.'" *Id.* (citation omitted).

The Supreme Court in *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975), explained the requirement that a federal court may only address a litigant's claim when there is an actual case or controversy in existence:

> The exercise of judicial power under Art III of the Constitution depends on the existence of a case or controversy. As the Court noted in *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971), a federal court has neither the power to render advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them." Its judgments must resolve " 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' "

*Id.* at 401, 95 S.Ct. 2330 (citations omitted).

RE/MAX asks for precisely what the Supreme Court and Article III of the Constitution forbid, an opinion advising what the law would be upon a hypothetical state of facts. Specifically, RE/MAX seeks a declaration that if Smythe, Cramer and other brokers joined in a group boycott, this boycott would violate the antitrust laws.

The cases cited by RE/MAX do not persuade the Court otherwise. In *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), an insurance company sought a declaratory judgment that it was not liable to defend a tort action against its insured for injuries suffered in an automobile accident. The victim of the accident had already sued the insured in state court. *Id.* at 271, 61 S.Ct. 510. The insurance company alleged that the terms of its insurance policy prevented it from indemnifying the insured in the suit. *Id.* at 272, 61 S.Ct. 510. The *Maryland* court held that declaratory relief was appropriate. *Id.* at 273–74, 61 S.Ct. 510. Unlike here, the tort victim's lawsuit was not hypothetical. The victim had already filed the lawsuit that the insurance company sought the court to declare that it had no obligation to defend. Here, however, the boycott that RE/MAX asks the Court to declare illegal has not happened yet.

Likewise, in *Kunkel v. Cont'l Cas. Co.,* 866 F.2d 1269 (10th Cir.1989), an insurance company sought a declaratory judgment that, by the terms of its insurance policy, it was not liable to defend its insured from an existing malpractice suit. The insurance company alleged that the policy expressly excluded the insured's actions. *Id.* at 1272. The court held that a declaratory judgment was proper although existence of coverage remained dependent upon the outcome of a collateral action charging the accountant with securities law violations and a determination that the terms of the policy did not except any liability he incurred. *Id.* at 1275. Again, the *Kunkel* plaintiff had already filed the lawsuit for which the insurance company sought a declaration that it was not obligated to defend while the alleged boycott here is hypothetical.

"Issues which will likely never come to pass should remain undecided." *Id.* at

1274. Therefore, the Court finds that RE/MAX has not alleged a case or controversy.

### III.  Conclusion

For the reasons discussed above, the Court grants Smythe, Cramer's motion in part and denies it in part.  The Court dismisses the defamation and declaratory judgment claims.  Additionally, the Court dismisses the state and federal antitrust claims alleging a section 1 conspiracy between Smythe, Cramer and its current and former agents.  However, the Court denies the motion as to the breach of contract and tortious interference with prospective business relationships claims.

IT IS SO ORDERED.